United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KYLE VOGT,

               Plaintiff,

     v.

RAYTHEL FISHER,

               Defendant.

Case No. 20-cv-03130-EMC

**PUBLIC/REDACTED VERSION**

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

Docket No. 1

       A jury in San Mateo County Superior Court convicted petitioner Kyle Vogt of aggravated sexual assault of a minor under age 14, nine counts of lewd or lascivious acts involving substantial sexual conduct with a minor under age 14, exhibiting harmful material to a minor with the intent of seduction, and two counts of committing a lewd or lascivious act with a minor age 14 or 15. *See* Cal. Pen. Code §§ 269(a), 288(a), 288.2(a), 288(c)(1). The state court sentenced him to 15 years to life, plus 24 years in prison.

       Currently pending before the Court is Mr. Vogt's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to seek relief from his state court conviction. According to Mr. Vogt, his constitutional rights were violated, primarily as a result of instructional error, improper admission of evidence, and ineffective assistance of counsel. For the reasons explained below, the Court **DENIES** Mr. Vogt's petition.

## I.    BACKGROUND

A.   Factual Background

       On April 29, 2014, a jury convicted Mr. Vogt for sexually abusing his girlfriend's younger half-sister, J.A., since she was five or six years old until she was about 13 years old. *See* Docket

No. 30-1 ("Ex. H") (California Court of Appeal opinion) at 1, 3.  He also committed lewd acts on

J.A.'s half-sister, Jo.A. and on a family friend's daughter, A.P.  *Id.*  The following is an excerpt

from the statement of facts in the California Court of Appeal's opinion in *People v. Vogt*, No.

A145304 (Cal. Ct. App. Nov. 18, 2018):

> ### The Family History
>
> Melissa is the oldest of six sisters, and J.A. is the youngest.  Keith is the father of the four middle sisters.  In 1999, the girls' mother died.  Melissa, who was eighteen years old at the time, moved to South San Francisco along with her infant son Antonio, and three-year-old half sister, J.A., to live with their aunt, Luisa.
>
> In the summer of 2002, Melissa moved to Davis with Antonio to study at UC Davis.  That fall, Melissa started dating defendant.  Around November 2006, Melissa bought a house on Hillside Boulevard, close to where J.A. was living with Luisa.  In June 2009, Keith, along with Melissa's two other sisters, Jo.A. and K.A., moved into the Hillside Boulevard home.  Defendant moved out of the Hillside Boulevard home for two periods of time when he and Melissa broke up.  The first period was "[m]aybe" in 2009, and the second period was in 2010 and 2011.
>
> Defendant frequently bought J.A., Jo.A., and K.A. gifts including shoes, clothes, and phones.  Occasionally, defendant and the girls kept the gifts a secret if they thought Melissa or Luisa would disapprove.
>
> ### J.A. Reports Defendant's Abuse
>
> When J.A. was in seventh grade, she gave her friend Alanii a letter stating that her sister's boyfriend had been "messing with" her since she was eight years old, that she was "getting raped," and that she would get killed if Alanii told anyone.  Alanii gave the letter back to J.A. and kept the secret.
>
> When J.A. was a high school sophomore, she told another friend, Brianna, that defendant had been raping her since she was five years old.  J.A. asked Brianna not to tell anyone, and Brianna complied.
>
> In February 2012, when J.A. was 15 years old, she wrote a private message on Facebook to her sisters, Jo.A. and K.A., accusing defendant of raping her since she was five years old.  Jo.A. told her sister A.A. what she had learned, and A.A. alerted Luisa.  Luisa told J.A., who was staying with her sister in Reno at the time, to return home.  Upon her return, J.A. gave Luisa a letter disclosing the abuse.  Luisa immediately took J.A. to the police station where they met briefly with Sergeant Kenneth Chetcuti.  Chetcuti interviewed J.A. further and arranged for her to be medically examined.

### The Investigation

Chetcuti arranged for J.A. to make a pretext call to defendant. A recording of the call was played for the jury. During the call, J.A. confronted defendant about having molested and raped her, but defendant said he could not hear her and that there was a bad connection, and the phone call was disconnected, even though Chetcuti heard no static or voices cutting in and out. During the call, defendant denied ever having raped or threatened J.A.

Chetcuti interviewed J.A.'s family members and friends and identified Jo.A. and A.P. as two more potential victims.

Chetcuti arranged for A.P. make a pretext call to defendant. A recording of that call was played for the jury. As with J.A.'s pretext call, defendant claimed he could not hear A.P., and the call was eventually disconnected.

Defendant was arrested on March 1, 2012, at Melissa's Hillside Boulevard home. Officers took a cell phone from defendant's pocket that had the same phone number used for the pretext calls. They also seized a backpack containing electronic storage devices, and computers, including a black and gray Dell desktop computer stored in the garage.

At Chetcuti's request, criminalist Terence Wong searched the Dell computer for defendant's name and email address, child pornography, and any communications between defendant and J.A.

### J.A.'s Allegations of Abuse in Davis (Counts 1-4)

Several witnesses testified that J.A. visited Melissa in Davis at least once a month during the school year and several times during the summer. During these visits, defendant watched J.A. and Antonio when Melissa had to go to work or class.

J.A. testified that defendant first had sex with her in Davis in the summer when she was five years old. Defendant, who was wearing only a shirt, played adult pornography videos and told J.A. to do what the people were doing in the videos. He removed J.A.'s clothes and put a blanket over her face. J.A. felt defendant pull her legs apart and press between her legs with his penis. His penis went inside J.A.'s vagina, causing her pain. J.A. complained, but defendant told her it would not hurt. This continued for an hour, until Melissa came home. Defendant then told J.A. to take a shower and threatened to kill her if she said anything. J.A. went into the bathroom and saw blood dripping down her legs and onto the floor. She took a shower and wiped the blood off the floor so Melissa would not see it.

J.A. testified that defendant had sexual intercourse with her about nine more times during her visits to Davis. Each time, she and defendant were in Melissa's bedroom, and defendant played pornography, put his penis in J.A.'s vagina, told her to take a shower, and threatened to kill her if she told anyone.

J.A. did not want anybody to know what was happening because she was scared she would get hurt. Melissa never noticed anything unusual. Luisa observed only that J.A. became more quiet around this age.

### *J.A.'s Allegations of Abuse at Antoinette Lane (Counts 6-7)*

J.A. continued to visit Melissa, Antonio and Kyle after they moved to Antoinette Lane in South San Francisco. J.A. testified that defendant had sexual intercourse with her about 20 times at the Antoinette Lane apartment. Each time, defendant played pornography videos, put blankets or pillows over J.A.'s face, and ejaculated onto a towel. Defendant continued to tell J.A. he would kill her if she told anyone.

### *J.A.'s Allegations of Abuse at the Hillside Boulevard Home (Counts 8-11)*

J.A. regularly visited Melissa's home on Hillside Boulevard. J.A. testified that, as in the past, defendant would watch pornography, put something over her face, have intercourse with her, and ejaculate on a towel. J.A. testified that defendant played the pornography on a gray Dell desktop computer. These assaults occurred about 10 times, usually in the back room or Melissa's bedroom, but also in Antonio's room and the garage. Defendant also began engaging in oral sex with J.A. before and after intercourse. Defendant made J.A. orally copulate him on about six occasions. Defendant orally copulated J.A. about 10 times.

The sexual abuse did not cause J.A. physical problems, and no one noticed anything. J.A. continued acting normally because she feared defendant would kill her or Melissa would get hurt if anyone found out. However, she tried to avoid spending the night or being alone with defendant. Defendant stopped having intercourse and oral sex with J.A. when she was 13 years old, around the time Keith, Jo.A., and K.A. moved into the Hillside Boulevard house. However, defendant later offered J.A. money if she would send him nude photographs of herself, but she declined.

### *A.P.'s Allegations of Lewd Conduct (Counts 12-13)*

A.P. and her family lived next door to J.A., and the parents became good friends with defendant and Melissa. A.P. testified that when she was 12 or 13 years old, she began to feel like she was defendant's girlfriend. They called and sent text messages to each other, sometimes using coded messages. Defendant told A.P. to delete their messages because he could get in trouble if anyone saw them. A.P.'s parents once found some of their texts and confronted defendant, but A.P. and defendant continued communicating until A.P.'s senior year of high school.

When A.P. was 12 or 13 years old, she was with defendant in the back room of Melissa's house when defendant showed her a picture of an erect penis on his phone. He said it was his penis and commented that it was large. He also said there were condoms in a nearby drawer. Defendant and A.P. then "made out" by kissing and

touching.

When A.P. was 14 years old, she slept over at Melissa's house several times. One night, defendant woke A.P. and they went to the back room, where he kissed her and put his hand on her back under her shirt. A.P. testified about interactions she had with defendant other than the acts that were charged. When A.P. was 14, she was on a video chat with defendant. He said she had a nice body and asked to see more of it, so A.P. took off her shirt. Defendant said A.P. should take off the rest, and she took off her bra.

A.P. further testified that when she was 15, she and defendant made out in A.P.'s father's shop and defendant wrote their combined initials "KAVP" on a wall. When A.P. was 16, she and defendant "made out" at A.P.'s house by "dry humping" with their clothes on. Also, defendant asked A.P. to send him a nude photo of herself, though she did not do so.

During the 2012 investigation, officers found on the micro SD card in defendant's phone pictures of a penis, which Melissa identified as defendant's. Officers also photographed the "KAVP" graffiti on the wall in A.P.'s father's shop.

### Jo.A.'s Allegations of Lewd Conduct (Count 14)

Jo.A. testified that when she was living in Melissa's house, she and defendant once had a fight. When defendant apologized, he put his hand on her knee, said she was like a sister to him, and gave her a kiss or "peck" on the neck. Jo.A. testified that it felt "weird" and "inappropriate" but did not feel it was sexual. Jo.A. was 15 years old at the time.

Jo.A. and K.A. both described other interactions with defendant that made them uncomfortable. Once, Jo.A. was talking with defendant about a scar she had on her chest. Jo.A. was wearing a low-cut shirt, and while they were talking, defendant put his finger in her shirt, pulled on her shirt and the cup portion of her bra to expose her breast, and looked and laughed. Jo.A. testified that this made her feel uncomfortable, and she walked out of the room. Jo.A. told K.A. about this incident. On another occasion, Jo.A. was bending over, and defendant stuck his finger inside her pants and joked that "crack kills." Defendant would tell the girls they were beautiful, and rub their feet or touch their hair. K.A. testified that when she was 13 years old, defendant asked if she was a virgin, and he suggested to K.A. that they could have a "quickie." Defendant teasingly said that Jo.A. should strip for him to pay him back for buying things for her, and that he would throw money at K.A. if she took her clothes off. Jo.A. and K.A. also were upset and complained to Melissa and Keith that defendant made everyone keep their bedroom doors open and would walk into their room without knocking when they were not fully dressed. In addition, J.A. and K.A. thought defendant had taken photos of them in the shower.

On the micro SD card in defendant's phone, officers found deleted pictures that appeared to have been taken through the window of Antonio's room while Jo.A. was taking selfies wearing only a bra

and pajama pants.  Officers also found on defendant's phone deleted pictures of K.A. and unidentified females, nude and partly clothed, which appeared to have been taken through the window of Melissa's bathroom.  On the Dell computer, officers found traces of deleted selfies that Jo.A. had taken in her underwear or nude.  Jo.A. testified that the selfies had been on the memory card in her pink camera that went missing, and that she had never downloaded the selfies to the computer or shared them with defendant.

### The Child Pornography Videos

In examining the Dell computer retrieved from Melissa's Hillside Boulevard home, Wong found seven videos that he suspected of being child pornography based on file names such as "pedophilia" and "PTHC" (pre-teen hard core).  Four of the videos were saved to the computer on April 1, 2009, one was saved on June 9, 2009, and two others were saved on August 1, 2009.  Melissa, Jo.A. and Keith testified that defendant was living at the Hillside Boulevard house around that time.  Chetcuti viewed the videos and found they contained child pornography.  He described the contents of the videos and showed the jury 18 still photographs excerpted from the videos.

The first video was entitled "Hot mother licks her 8-year old daughters sweet pussy as her brother fucks her."  Chetcuti testified that in the video, a woman and a girl who appeared to be around 8 years old performed sexual acts on a boy, about age 10.

The second video was titled "blond 10-year old girl and boy play sex."  Chetcuti testified that it depicted "a boy and a girl having sexual intercourse" in "many positions" with an adult nearby.

The third video, four minutes long, was "Two girls, maybe 12 years old, pedophile's dream."  Chetcuti testified that it depicted two girls fondling an elderly man's penis and performing oral copulation on him before the man performs oral sex and sexual intercourse with one of the girls.

The fourth video was called "12-year old boy fucks 12-years old girl kiddie pedo by Lolita."  Chetcuti testified that it depicted intercourse between a boy and girl appearing to be 12 years old.

The fifth video was titled "Two, 13-year old girls get cum in face."  Chetcuti testified that the video showed two girls, appearing to be about 13 years old, performing oral sex on a man and kissing each other, then the male masturbating and ejaculating on a girl's face and chest.

The sixth video was "Vicky compilation 10-year old gets what she wants.  Nude naked pedo XXX hardcore."  Chetcuti testified that the video depicted a girl about 10 years old wearing a mask and performing sex acts with an adult male.

The seventh video was just under 7 minutes long and called "Incesto Vicky 2."  Chetcuti testified that it depicted a man having anal sex with a girl who was young enough that her breasts had not yet

United States District Court
Northern District of California

developed.

***Defendant's Character Witnesses***

The defense presented two character witnesses, Mylyka Sanderford and Grace Barajas. Both testified they knew defendant, had never seen him engage in inappropriate behavior around young girls, and had no concerns with him interacting with their daughters. Sanderford, who lived in Woodland, testified that she dated defendant for six months in the spring or summer of 2009 and, to her knowledge, defendant was living "out in the Bay Area" at the time and would come to visit her in Woodland.

Ex. H at 2–9.

B.   Procedural Background

After the jury convicted Mr. Vogt for all the crimes with which he had been charged, new defense counsel filed a motion for a new trial.[1]  On April 15, 2015, the trial court denied the motion. *See* Docket No. 29-19.  On May 29, 2015, the trial court sentenced Mr. Vogt to a total prison term of 15 years to life plus 24 years. *Id.* at 1708–14.  Mr. Vogt appealed his convictions, but the California First District Court of Appeal affirmed on November 6, 2018. *See* Ex. H.  Mr. Vogt then petitioned the California Supreme Court for review, but review was denied on February 13, 2019. *See* Docket No. 30-2, Ex. J.  On February 25, 2020, Mr. Vogt filed a petition for writ of habeas corpus in the California Supreme Court for the purpose of exhaustion of state remedies for federal constitutional error. *See* Docket No. 30-3, Ex. K.  The state petition remained pending at the time of filing of this federal habeas corpus petition, in May 2020.  The California Supreme Court denied Mr. Vogt's petition for writ of habeas corpus on April 21, 2021. *See* Docket No. 30-3, Ex. L.

On May 6, 2020, Mr. Vogt filed his habeas petition with this Court.  Docket No. 1 ("Pet.").  On November 22, 2021, Raythel Fisher ("Respondent"), the warden at Valley State Prison, where Mr. Vogt is in custody filed his answer to the order to show cause.  Docket No. 28 ("Answer").  On January 6, 2022, Mr. Vogt filed his traverse to the answer.  Docket No. 35 ("Traverse").

---

[1] Mr. Vogt's trial counsel was Steven Whitworth.  His counsel for motions for a new trial was Matthew A. Sullivan.  His counsel for his direct appeal before the California Court of Appeal and his petition before the California Supreme Court was Heather J. Mackay.  His counsel for the current petition is Charles M. Bonneau, Jr.

United States District Court
Northern District of California

## II.      JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in San Mateo County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## III.      STANDARD OF REVIEW

Mr. Vogt's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Specifically, habeas relief may be granted if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Id.* at 803.

## IV.     DISCUSSION

A.     CALCRIM Nos. 375 and 1191 Jury Instructions

Mr. Vogt asserts a violation of his due process rights because two jury instructions provided that uncharged acts used to show sexual intent and criminal propensity only needed to be proven by a preponderance of the evidence. Pet. at 17–27.  He argues that the preponderance of evidence instruction impermissibly lessened the prosecution's burden to prove the charged offenses beyond a reasonable doubt. *Id.* at 17.

1.     Background

During trial, the prosecution introduced evidence of "other crimes," such as videos and still photographs of child pornography, to show that Mr. Vogt had the intent and propensity to commit the alleged crimes.  The trial court gave the following CALCRIM Nos. 375 and 1191 instructions. CALCRIM No. 375, California's standard jury instruction regarding the use of evidence of an uncharged offense admitted to prove identity, intent, common plan, etc., is as follows:

> The People presented evidence of other behavior by the defendant that was not charged in this case.
>
> You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> If the People have not met this burden, you must disregard this evidence entirely.
>
> If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:
>
> The defendant acted with the intent to arouse, appeal to, or gratify the lust, passions or sexual desires of himself or the child in Counts 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, and 14 in this case.

United States District Court
Northern District of California

1    In evaluating this evidence, consider the similarity or lack of
     similarity between the uncharged acts and the charged offenses.

2    Do not consider this evidence for any other purpose except for the
3    limited purpose set forth in CALCRIM No. 1191.

4    Do not conclude from this evidence that the defendant has a bad
     character or is disposed to commit crime.

5    If you conclude that the defendant committed the uncharged acts
6    that conclusion is only one factor to consider along with all the other
     evidence.  It is not sufficient by itself to prove that the defendant is
7    guilty of the crimes charged in this case or that the allegations
     charged in this case have been proved.  The People must still prove
     each charge and allegation beyond a reasonable doubt.

8

9    CALCRIM No. 375.  CALCRIM No. 1191, California's standard jury instruction regarding the

10   use of evidence of an uncharged sex offense is as follows:

11   The People presented evidence that the defendant committed the
     crimes of possession of child pornography and annoying or
12   molesting a child that were not charged in this case.  These crimes
     are defined for you in these instructions.

13

14   You may consider this evidence only if the People have proved by a
     preponderance of the evidence that the defendant in fact committed
15   the uncharged offenses.  Proof by a preponderance of the evidence is
     a different burden of proof from proof beyond a reasonable doubt.
16   A fact is proved by a preponderance of the evidence if you conclude
     that it is more likely than not that the fact is true.

17   If the People have not met this burden of proof, you must disregard
18   this evidence entirely.

19   If you decide that the defendant committed the uncharged offenses,
     you may, but are not required to, conclude from that evidence that
20   the defendant was disposed or inclined to commit sexual offenses,
     and based on that decision, also conclude that the defendant was
21   likely to commit the offenses charged in this case.  If you conclude
     that the defendant committed the uncharged offenses, that
22   conclusion is only one factor to consider along with all the other
     evidence.  It is not sufficient by itself to prove that the defendant is
23   guilty of the offenses charged in this case.  The People must still
     prove each charge and allegation beyond a reasonable doubt.

24   Do not consider this evidence for any other purpose except for the
25   limited purpose set forth in CALCRIM 375.

26   CALCRIM No. 1191.

27   These instructions state that the "other crimes" evidence is not sufficient by itself to prove

28   guilt.  However, Mr. Vogt asserts, as he did on direct appeal, that the instructions violate his due

10

process rights because the "other crimes" evidence "nevertheless figures into the jury's willingness to convict, and therefore must be subject to the constitutional requirement of proof beyond a reasonable doubt." Pet. at 20. In Mr. Vogt's view, the "other crimes" evidence "crucially served to corroborate the victim's version of events, particularly in regard to the victim's description of pornographic videos." *Id.* at 21. "It also served as evidence that the defendant (having possessed child pornography) was disposed to commit lewd and lascivious conduct." *Id.* He argues that the "other crimes evidence" was part of the "direct chain of proof" of guilt, and therefore, had to be proved beyond a reasonable doubt. *See* Docket No. 30, Ex. E (Vogt opening brief on direct appeal) at 84–98.

The California Court of Appeal rejected Mr. Vogt's instructional error claim. The state appellate court applied the California Supreme Court's decision in *People v. Reliford*, 29 Cal. 4th 1007 (2003) in upholding CALCRIM Nos. 375 and 1191. Ex. H at 15–18. In *Reliford*, the instruction at issue was a prior version of CALCRIM No. 1191. *Reliford*, 29 Cal. 4th at 1011–12. The instruction provides in part,

> "If you find that the defendant committed a prior sexual offense in 1991 involving [the alleged victim], you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.
>
> However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense in 1991 involving [the alleged victim], that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime. The weight and significance of the evidence, if any, are for you to decide.
>
> You must not consider this evidence for any other purpose."

*Id.* at 1012. The California Supreme Court acknowledged that some California courts of appeal "have feared that a jury might interpret the instruction to permit conviction of the *charged* offenses under the preponderance-of-the-evidence standard." *Id.* at 1015 (emphasis in original). But the court held that it did "not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof" because "[n]othing in the instructions authorized the jury to use the preponderance-of-the-evidence

standard for anything other than the preliminary determination whether defendant committed a prior sexual offense in 1991 involving [the alleged victim]." *Id.* at 1016. Instead, the instructions properly "explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.'" *Id.*

The California Supreme Court also concluded the instruction was not "too complicated for jurors to apply" because this was "not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial." *Id.* (citing various statutes related to entrapment, co-conspirator statements, and lawful possession of controlled substances). The court presumed that the jurors could "grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." *Id.* The court also recognized that the instruction could be improved by adding another cautionary statement, which is similar to the language in the instructions here: "If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." *Id.*

On direct appeal, Mr. Vogt asserted that *Reliford* was distinguishable from his case based on *People v. Tewksbury*, 16 Cal.3d 953 (1976). Ex. H at 16. In *Tewksbury*, the defendant had been convicted of two counts of robbery and the murder of one of the victims based on the testimony of his girlfriend, who was an accomplice, and of another woman who had been charged for the same crimes and then had been granted immunity. *Tewksbury*, 16 Cal.3d at 958. The jury had been instructed to answer whether the other woman was also an accomplice based on a preponderance of evidence. *Id.* at 962–63. The California Supreme Court held that the question of whether the other woman was an accomplice "is collateral to the question of the accused's guilt or innocence," meaning the proof of such a fact "is not one which must be established in the direct chain of proof of the accused's guilt." *Id.* at 965. Thus, the court concluded that the collateral fact can be proved by a preponderance of the evidence. *Id.* In this case, Mr. Vogt relied on *Tewksbury*, to assert that the "other crimes" evidence was "in the direct chain of proof" of his guilt

1    and therefore the correct standard should have been proof beyond a reasonable doubt.  Ex. H at 16.

2         However, the state appellate court rejected this argument by relying on another California

3    Court of Appeal decision in *People v. Anderson*, 208 Cal.App.4th 851 (2012), where the court had

4    rejected a similar argument.  In *Anderson*, the defendant had been convicted for continuous sexual

5    abuse of a child under the age of 14 years and three counts of lewd act with a child under the age

6    of 14 years.  *Anderson*, 208 Cal.App.4th at 856.  Like Mr. Vogt, the defendant contended that "the

7    preponderance standard applied to the uncharged offenses impermissibly reduced the People's

8    burden of proof on the charged offenses."  *Anderson*, 208 Cal.App.4th at 894.  One of the

9    uncharged offenses was an incident during which the defendant had fondled the victim's genital

10   area while she swung on a punching bag.  *Id.* at 894.  The defendant relied on *Tewksbury* and

11   claimed that "because this incident was the first act of abuse, it was part of 'the direct chain of

12   proof' of his guilt and therefore had to be proved beyond a reasonable doubt."  *Id.*  The court

13   rejected this argument, holding that "a defendant's propensity to commit a particular type of

14   crime, here lewd act, is the type of collateral fact addressed in *Tewksbury*" and the "fact one of the

15   uncharged offenses marked the start of Anderson's continuous course of conduct is insufficient to

16   alter this result."  *Id.* at 897.

17        Likewise, in this case, the state appellate court concluded that "the uncharged offense of

18   possessing child pornography does not directly bear on any link in the chain of proof of any

19   element of the charged offenses of rape, lewd or lascivious conduct, or exhibiting harmful

20   materials (a picture of defendant's erect penis, not child pornography) to a minor."  Ex. H at 17.

21   The court held that "[w]hile the child pornography evidence was also offered to establish the

22   essential element of defendant's sexual intent in committing the charged offenses under sections

23   288, subdivision (a), and 288.2, this did not make the uncharged offense a link in the direct chain

24   of proof of the sexual intent element."  *Id.*  "Rather, 'facts regarding another offense are simply

25   evidentiary facts to be considered along with other evidence in the case on the question of . .

26   . intent; although the jury may entertain some reasonable doubt as to the proof of the other offense

27   or of particular items of evidence, it is sufficient if they are convinced beyond a reasonable doubt

28   of the ultimate fact of . . . intent.'"  *Id.* (quoting *People v. Mendoza*, 37 Cal.App.3d 717, 724

United States District Court
Northern District of California

1   (1974)).  The state appellate court summarily rejected Mr. Vogt's instructional error claim.  Ex. H

2   at 17–18.

3         2.    <u>Analysis</u>

4         To obtain federal habeas relief for an error in the jury instructions, a petitioner must show

5   that the error "so infected the entire trial that the resulting conviction violates due process."

6   *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  A jury instruction violates due process if it fails to

7   give effect to the requirement that "the State must prove every element of the offense."  *Middleton*

8   *v. McNeil*, 541 U.S. 433, 437 (2004).  "A single instruction to a jury may not be judged in artificial

9   isolation, but must be viewed in the context of the overall charge."  *Id.* (internal quotation marks

10  omitted).  "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such

11  an error does not necessarily constitute a due process violation."  *Waddington v. Sarausad*, 555

12  U.S. 179, 190 (2009) (quoting *Middleton*, 541 U.S. at 437).  Where an ambiguous or potentially

13  defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood"

14  that the jury applied the challenged instruction in a way that violates the Constitution.  *Estelle*, 502

15  U.S at 72 & n.4.  If a constitutional error is found in the jury instructions, the federal habeas court

16  also must determine whether that error was harmless by looking at the actual impact of the error.

17  *Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998).

18        Here, the state appellate court's rejection of Mr. Vogt's claim was not contrary to, and did

19  not involve an unreasonable application of, clearly established United States Supreme Court

20  precedent.  *See* 28 U.S.C. § 2554(d).  Mr. Vogt contends that the failure to require proof beyond a

21  reasonable doubt regarding the uncharged offenses violates controlling U.S. Supreme Court

22  authority.  Traverse at 4.  However, the United States Supreme Court has never held that the

23  introduction of propensity or other allegedly prejudicial evidence violates due process.  *See*

24  *Estelle*, 502 U.S. at 68–70.  *Estelle* specifically left open the question regarding propensity

25  evidence.  *See id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due

26  Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

27  charged crime").  But when the U.S. Supreme Court "cases give no clear answer to the question

28  presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court

         United States District Court
         Northern District of California

1   unreasonabl[y] appli[ed] clearly established Federal law.'" *Wright v. Van Patten*, 552 U.S. 120,

2   126 (2008) (alterations in original) (citation omitted).

3        The California Court of Appeals reasonably applied *Reliford* to uphold the challenged

4   instructions.  The instructions here use even more direct cautionary language than the instructions

5   in *Reliford*—they caution that if the jury concludes that Mr. Vogt committed the uncharged

6   offenses, that "is only one factor to consider along with all the other evidence" and that "it is not

7   sufficient by itself to prove that the defendant is guilty of the crimes charged in this case."

8   Answer at 13; CALCRIM Nos. 375 and 1191.

9        Mr. Vogt points to the dissent in *Reliford* to assert that the preponderance-of-the-evidence

10  standard for the uncharged offenses is "potentially misleading." *Reliford*, 29 Cal.4th at 1017

11  (Kennard, J., concurring and dissenting in part); Pet. at 26.  Notwithstanding that a dissenting

12  opinion is not binding precedent, the Ninth Circuit has affirmed the *Reliford* analysis.  *See Schultz*

13  *v. Tilton*, 659 F.3d 941, 945 (9th Cir. 2011).  In *Schultz*, the Ninth Circuit held that a California

14  Court of Appeal had not acted contrary to federal law in applying the *Reliford* analysis to uphold a

15  similar instruction to the one here because the instruction "in no way suggests that a jury could

16  reasonably convict a defendant for charged offenses based merely on a preponderance of the

17  evidence." *Schultz v. Tilton*, 659 F.3d 941, 945 (9th Cir. 2011).  Similarly, courts in this district,

18  including this Court, have upheld CALCRIM Nos. 375 and 1191.  *See, e.g.*, *Rushing v.*

19  *Neuschmid*, No. 18-CV-02351-BLF, 2020 WL 2404666, at *20 (N.D. Cal. May 12, 2020)

20  (upholding CALCRIM No. 375); *Raygoza v. Holland*, No. 16-CV-02978-EMC, 2018 WL

21  6002325, at *18 (N.D. Cal. Nov. 15, 2018) (upholding CALCRIM No. 1191).  Thus, the state

22  appellate court reasonably upheld CALCRIM Nos. 375 and 1191.[2] Ex. H at 17–18.

23       Mr. Vogt contends that the Court should not follow *Reliford* and *Schultz* because "it is

24  unreasonable to conclude that this conviction was reached without direct reliance on the

25

26  ───────────────
    [2] Mr. Vogt also points to *Sullivan v. Louisiana*, where the Supreme Court held that a "'beyond a

27  reasonable doubt' factual finding cannot be made where the instructional error consists of a
    misdescription of the burden of proof, which vitiates *all* the jury's findings." *Sullivan v.*

28  *Louisiana*, 508 U.S. 275, 281 (1993) (emphasis in original).  But *Sullivan* is inapposite because
    there was no instructional error here.

United States District Court
Northern District of California

15

uncharged offense." Traverse at 7. But the state appellate court reasonably concluded that "the uncharged offense of possessing child pornography does not directly bear on any link in the chain of proof of any element of the charged offenses of rape, lewd or lascivious conduct, or exhibiting harmful materials (a picture of defendant's erect penis, not child pornography) to a minor." Ex. H at 17. The state appellate court reasonably concluded that a jury could have reasonable doubt about Mr. Vogt's possession of child pornography so long as "they are convinced beyond a reasonable doubt of the ultimate fact of . . . intent." Ex. H at 17.

Mr. Vogt's reliance on *Kipp v. Davis*, 971 F.3d 939 (9th Cir. 2020) is misplaced. In *Kipp*, the defendant was tried for the first-degree murder and attempted rape of a woman named Howard in Orange County, but the prosecution presented evidence of an unadjudicated murder and rape of a woman named Frizzell in Los Angeles County. *Kipp*, 971 F.3d at 943. The Ninth Circuit held that "[i]n order to have properly admitted the unadjudicated Frizzell crime evidence at the Howard trial, the state court was required to have found a 'pattern and characteristics of the crimes [to] be so unusual and distinctive as to be like a signature.'" *Id.* at 960. Because the "state court reached that conclusion—but only after disregarding all the dissimilarities between the two crimes" it had "made a crucial factual error and failed to consider the entire state record." *Id.* Therefore, the Ninth Circuit concluded that the state court's "decision was based on an unreasonable determination of the facts" and "that Kipp's due process right to a fair trial was violated." *Id.* In contrast, here, the evidence of child pornography was probative to show propensity and intent of the charged offenses, and the jury was properly instructed that in order to consider this evidence as a factor informing intent, it had to make a preliminary finding that the predicate conduct occurred. *See infra* Part IV.C.1. As a result, Mr. Vogt's due process right to a fair trial was not violated by wrongful admission of evidence.

Furthermore, even if there was a constitutional error, there was no prejudice by the instructions. Answer at 13. To find a prejudicial error, the court must find that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993). In this case, there was other compelling evidence to support Mr. Vogt's conviction. The trial court found that the testimony of the victims was

16

"extremely credible," "forthright, honest, and straightforward," and that their demeanor "was not indicative of anyone that was attempting to manipulate the situation," hide facts, or manufacture facts.  Docket No. 29-18 ("14RT") at 1652–53.[3]  For example, J.A. disclosed Mr. Vogt's ongoing sexual abuse twice to her friends, once in the seventh grade and again in the tenth grade.  A.P.'s testimony was corroborated by the text messages between her and Mr. Vogt that her parents had seen on her phone, the "KAVP" found by the police in her father's shop at the precise location where she said Mr. Vogt had written it during one of their "make out" sessions, and additional text messages from Mr. Vogt on A.P.'s phone when the police interviewed her.  The trial court also found that the pretext phone calls that J.A. and A.P. made to Mr. Vogt were further factors that the jury could have or may have used to judge the credibility of the witnesses because the "feigned dropped calls" "was an effort on the part of [Mr. Vogt] to act like the call was dropped or to pretend like he couldn't hear."  14RT at 1653.  There was, in short, other substantial evidence of Mr. Vogt's criminal intent.

In response, Mr. Vogt contends such evidence does not support his conviction and therefore the "other crimes" evidence was necessary to conviction.  Traverse at 9–10.  He argues that J.A.'s disclosure of the sexual abuse was not sufficient to convict him because "it could be argued that had she been molested, she would not have sworn her friend to secrecy, and if her friend really believed that J.A. was in danger, she would have reported it despite J.A.'s request for secrecy."  *Id.* at 9.  He further argues that the "KAVP" in A.P.'s father's shop "could have been left by anyone, at any time" and that he "made no harmful admissions in text messages with A.P. or in the pretext phone calls, which were calculated to draw him out."  *Id.*  He also contends that the fact that J.A.[4] "delayed for years before speaking to anyone or making a police complaint, and that she may have been motivated to prevent her sister's marriage to petitioner, suggests that the charges were fabricated."  *Id.* at 9–10.

His arguments mainly attack the credibility of the victims but in general, a federal habeas

---

[3] "14RT" stands for Reporter's Transcript, volume 14.

[4] Mr. Vogt mistakenly argues that A.P. delayed for years before disclosing the abuse because she may have been motivated by her sister's marriage.  Traverse at 9.  The Court assumes Mr. Vogt meant J.A. who is Melissa's sister, and not A.P. who is the family friend's daughter.

United States District Court
Northern District of California

1   court does not question a jury's credibility determinations, which are entitled to near-total

2   deference.  *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).  Although courts are "permitted to

3   disregard inherently improbable testimony,"  *United States v. Ramos-Rascon*, 8 F.3d 704, 709 n.3

4   (9th Cir. 1993) (citations omitted), in this case, the victims' testimonies were not inherently

5   improbable.  During the motion for a new trial, the trial court noted that "the jury found the

6   witnesses also to be credible" and that no argument or evidence presented during the new trial

7   hearing "would have led [the court] to reach any other conclusion with respect to the credibility of

8   those witnesses that testified."  Docket No. 29-19 ("15RT") at 1664.  As a result, even if

9   CALCRIM Nos. 375 and 1191 were constitutional errors, there is no prejudice because the other

10  substantial evidence supports Mr. Vogt's conviction.

        Therefore, Mr. Vogt's claim fails because the state court's rejection of his claim was not

12  contrary to, and did not involve an unreasonable application of, clearly established United States

13  Supreme Court precedent, or involved an unreasonable determination of the facts in light of the

14  evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2554(d).  The Court **DENIES**

15  Mr. Vogt's CALCRIM Nos. 375 and 1191 instructional error claim.

16  B.    Child Sexual Abuse Accommodation Syndrome Evidence and Jury Instruction

17        Mr. Vogt also asserts a violation of his due process rights by the admission of Child Sexual

18  Abuse Accommodation Syndrome ("CSAAS") evidence and the related jury instruction that stated

19  the jury may use CSAAS evidence to conclude that the accuser is believable. Pet. at 31–43.

20        1.    Background

21        During trial, the prosecution moved in limine to present an expert on CSAAS, Dr. Miriam

22  Wolf.  Ex. H at 27.  "Dr. Wolf testified that CSAAS is a framework for categorizing patterns of

23  behavior commonly observed in children who report sexual abuse . . . The five parts of CSAAS

24  are:  secrecy; helplessness; entrapment and accommodation; delayed, conflicting, and

25  unconvincing disclosure; and recantation."  *Id.* at 27–28.  The following is Dr. Wolf's testimony

26  as summarized by the California Court of Appeal:

27              Regarding secrecy, Dr. Wolf testified that abusers are usually more
              powerful and older than the child, and the child may think no one
28            will believe her if she says anything.  The abuser may also

United States District Court
Northern District of California

communicate that the matter should be kept secret, either by direct threats or subtle messages.  Secrecy may be promoted by "grooming"—special treatment like spending time with or buying gifts for the child.

As to helplessness, Dr. Wolf testified that children may feel they cannot go to someone for help, especially if the abuser is a caretaker or has authority over the child.  Thus, children do not often protest when they have to interact with a molesting family member.

With regard to entrapment and accommodation, Dr. Wolf testified that it can be emotionally difficult for a child to think a caregiver is doing something bad, so the child may come up with a different explanation or feel at fault.  Some children disassociate from what is happening and show no outward clues.

As for delayed, conflicted, and unconvincing disclosure, Dr. Wolf testified that children may not disclose the abuse to anyone until months or years later.  A child who does disclose abuse may be conflicted and the recounting may be jumbled.

Finally, as to retraction, Dr. Wolf testified that children may take back their claims once they understand the consequences of telling.

*Id.*  During cross-examination, Dr. Wolf, among other things, agreed with defense counsel that there is no major organization that accepts CSAAS as a diagnosis.  *Id.* at 28.  She also agreed that there was no way to tell whether a child had been sexually abused by looking at or even interacting with the child.  *Id.*  Defense counsel did not call an opposing expert.  *Id.* at 29.

The California Court of Appeal rejected Mr. Vogt's contention that the CSAAS is non-probative, non-reliable, and likely to mislead the jury because "the law in California is settled that CSAAS is relevant and probative for the limited purpose of rebutting misconceptions about child sexual abuse victims."  *Id.*  Specifically, the court relied on three California Supreme Court cases to conclude that "Dr. Wolf's testimony was probative and relevant to disabuse the jury of any misconceptions it may have had about the behavior of child sexual abuse victims such as J.A., who kept defendant's abuse secret for many years and did not outwardly show signs of abuse."  *Id.* at 31; *see People v. McAlpin*, 53 Cal.3d 1289, 1299–1300 (1991) (acknowledging that expert testimony on the common reactions of a child molestation victim is "admissible to rehabilitate [the child's] credibility" but is inadmissible "to prove that [the child] has in fact been sexually abused."); *People v. Bledsoe*, 36 Cal.3d 236, 247–49, 251–52 (1984) (concluding that expert testimony in a rape case was inadmissible because it served, "not to rebut misconceptions about

19

1   the presumed behavior of rape victims, but rather as a means of proving—from the alleged

2   victim's post-incident trauma—that a rape" had occurred); *People v. Brown*, 33 Cal.4th 892, 895,

3   900, 908 (2004) (holding that expert testimony in a domestic violence case could be admitted to

4   explain why domestic violence victims "often later deny or minimize the assailant's conduct" but

5   could not be admitted "to prove the occurrence of the charged crimes").

6       The court also noted that Dr. Wolf had more knowledge than jurors about the behavior of

7   child sexual abuse victims, and her testimony on this subject could assist the jurors in

8   understanding such behavior.  Ex. H at 32 (citing Cal Evid. Code § 801(a)).  Further, "[a]ny

9   potential confusion about the use of the CSAAS evidence was addressed by the limiting

10  instructions, which properly stated the law."  *Id.*  The trial court had instructed the jury, pursuant

11  to CALCRIM No. 1193, that Dr. Wolf's testimony about CSAAS "is not evidence that the

12  defendant committed any of the crimes charged against him" and that the jury "may consider this

13  evidence only in deciding whether or not J.A.'s conduct was not inconsistent with conduct of

14  someone who has been molested, and in evaluating the believability of her testimony."  *Id.* at 29.

15      2.   Analysis

16      The state appellate court's rejection of Mr. Vogt's claim was not contrary to, and did not

17  involve an unreasonable application of, clearly established U.S. Supreme Court precedent.  *See* 28

18  U.S.C. § 2554(d).

19          a.   Admission of CSAAS Evidence

20      In his petition, Mr. Vogt first contends that the California Court of Appeal misapplied state

21  law in finding that the CSAAS evidence had been properly admitted. Pet. at 36–38.  But it is

22  well-established that "it is not the province of a federal habeas court to reexamine state-court

23  determinations on state-law questions."  *Estelle*, 502 U.S. at 67.  "[F]ederal habeas corpus relief

24  does not lie for errors of state law."  *Id.*  Thus, Mr. Vogt's assertion that the state court misapplied

25  California law does not constitute a basis for the Court to grant federal habeas relief.

26      The Court turns to the question of whether the admission of the CSAAS evidence violated

27  Mr. Vogt's federal constitutional rights.  The admission of prejudicial evidence may make a trial

28  fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury

United States District Court
Northern District of California

20

may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original). "Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." *Id.*

Mr. Vogt argues the same claim he made on direct appeal, that the CSAAS evidence was unnecessary because "it is readily understandable that a child or teenager might delay reporting out of normal juvenile reticence" given that everyone has once been children. Pet. at 28. Specifically, he asserts that "the prevalence of sex education in modern elementary schools, and the public debate which surrounds the entire subject, make it highly unlikely that jurors typically still believe that minors are not exposed to the knowledge that sexual contact with adults is highly inappropriate and illegal." *Id.* at 37. According to Mr. Vogt, given that "[t]hese are matters of common knowledge[] it is not necessary to educate the jury on reasons why a child witness may hesitate to come forward." *Id.* As in his appeal, he fails again to cite any authority supporting this conclusory argument.

He also asserts that the trial court should not have admitted the CSAAS evidence because there was no foundation that Mr. Vogt was a caretaker or family member. Pet. at 37–38. Without any supporting authority, he claims that "CSAAS evidence is typically deemed relevant because the alleged perpetrator is a parent or step-parent, or has some institutional relationship to the victim such as teacher or counselor." *Id.* at 37. But there is no such foundation requirement for the admissibility of CSAAS evidence. Mr. Vogt cites to Dr. Wolf's testimony, but her testimony does not support his claim. *Id.* In response to a question regarding how a child might feel about a person who is supposed to be in a caretaking position and why he might be molesting them, she explained that "most children express a lot of ambivalence about a perpetrator who is also a caretaker or a family member" the reason being that "sexual abuse and the relationship is not all good or all bad." Docket No. 29-12 ("8RT") at 629. Dr. Wolf did not testify that CSAAS only occurs when the perpetrator is a caretaker or a family member. To the contrary, she testified that a perpetrator can be any adult who "grooms" a child by, *e.g.*, buying them gifts or spending time with them. 8RT at 624. Here, there "was ample evidence that petitioner engaged in such behavior

United States District Court
Northern District of California

1   with J.A. by caring for her when Melissa was working or at school and buying her things."

2   Answer at 20; *see* Docket No. 29-11 ("7RT") at 480, 482, 485–86, 497 (testimony about Mr. Vogt

3   taking care of J.A. when Melissa was at work or school); 8RT at 681, 689, 699–700 (J.A.

4   testifying about the gifts Mr. Vogt bought her).

5        Thus, the state appellate court reasonably found that "Dr. Wolf's testimony was probative

6   and relevant to disabuse the jury of any misconceptions it may have had about the behavior of

7   child sexual abuse victims such as J.A., who kept defendant's abuse secret for many years and did

8   not outwardly show signs of abuse."[5] Ex. H at 31–32.  Mr. Vogt asserts that the three California

9   Supreme Court cases that the state appellate court relied on are not applicable because they are

10  factually distinguishable.  *See McAlpin*, 53 Cal.3d at 1299–1300 (1991) (admitting the expert

11  testimony to explain the behavior of the mother and not the child to show that it was not unusual

12  for a parent to refrain from reporting her own child's molestation); *Bledsoe*, 36 Cal.3d at 247–49,

13  (1984) (concerning an adult rape victim); *Brown*, 33 Cal.4th at 895 (2004) (concerning a domestic

14  violence victim).  But the principles that the California Supreme Court applied in these three cases

15  also applies here—that expert testimony on rape trauma syndrome, battered woman syndrome, or

16  CSAAS can be admitted to counter misconceptions about the behavior of victims but cannot be

17  admitted to show that the victim was in fact subject to rape, domestic violence, or child sexual

18  abuse.[6]  *See id.*

19       Similarly, the Ninth Circuit rejected a habeas claim that the admission of CSAAS evidence

20

21  [5] Mr. Vogt cites out-of-circuit decisions from over twenty years ago where courts have excluded
    CSAAS evidence, but these cases are either distinguishable or consistent with the Court's
22  conclusion.  Pet. at 38; *see, e.g.*, Irving v. State, 705 So. 2d 1021, 1022–23 (Fla. Dist. Ct. App.
    1998) (concluding the admission of CSAAS evidence to prove that the alleged victim exhibited
23  symptoms of sexual abuse constituted harmful error); *State v. Foret*, 628 So. 2d 1116, 1131 (La.
    1993) (concluding that "CSAAS-based evidence should be admissible only for the limited purpose
24  of explaining, in general terms, certain reactions of a child to abuse that would be used to attack
    the victim/witness' credibility").

25  [6] Mr. Vogt points to *People v. Bowker*, where the California Court of Appeal held that it is
    improper for an expert to give "'general' testimony describing the components of the syndrome in
26  such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the
    child was sexually abused." *People v. Bowker*, 203 Cal.App.3d 385, 393 (Ct. App. 1988).  But the
27  subsequent California Supreme Court decisions in *McAlpin*, *Bledsoe*, and *Brown* where the court
    held that CSAAS testimony cannot be used to prove the occurrence of the charged crime do not
28  conflict with *Bowker*.  *See, e.g.*, *Brown*, 33 Cal.4th at 908 (citing *Bowker*, 203 Cal.Ap.3d at 394).

United States District Court
Northern District of California

violated the defendant's due process rights because "CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003). The Ninth Circuit has "rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses"—the same argument that Mr. Vogt advances here.[7] *Id.*; Traverse at 13, 15–16; *see also Patino v. Koenig*, No. 19-CV-04462-WHO (PR), 2020 WL 5257867, at *5 (N.D. Cal. Sept. 3, 2020) (relying on *McAlpin* and *Brodit* to deny a habeas claim that the admission of CSAAS testimony violated defendant's due process rights).

Mr. Vogt contends that *Brodit* is distinguishable and more akin to *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). Traverse at 15–16. Specifically, Mr. Vogt argues that the prosecutor improperly used the CSAAS testimony to bolster the witness' credibility. *Id.* He points to three parts of the prosecutor's argument where she reiterated Dr. Wolf's testimony that "a victim of a chronic sexual assault" will not be able to remember every detail of the assault, that 90% of sexual assault perpetrators are known by their victims,[8] and that perpetrators can groom

---

[7] Mr. Vogt contends that *Brodit* does not conform with subsequent California law concerning expert testimony. Traverse at 14. However, his reliance on *People v. Vang*, 52 Cal.4th 1038 (2011) is misplaced. In *Vang*, the Court of Appeal held that the trial court erred when it allowed a gang expert to respond to hypothetical questions regarding whether the defendants' assault was gang related. *Vang*, 52 Cal.4th at 1044. The Court of Appeal concluded that the prosecution could not use hypothetical questions that closely tracked the evidence to conceal an expert's improper testimony on the real defendants' subjective knowledge and intent. *Id.* The California Supreme Court reversed and held that "an expert may render opinion testimony on the basis of facts given in a hypothetical question that asks the expert to assume their truth." *Id.* at 1045 (internal quotation marks omitted). In this case, it is unclear what Mr. Vogt's argument is based on *Vang*. He asserts that the "only reason Dr. Wolf was asked to testify was that her opinion was relevant to the victim's credibility." Traverse at 14. To the extent that his argument is that Dr. Wolf's testimony is improper because it is used to bolster the victims' credibility, his argument fails for the reasons above.

[8] Mr. Vogt contends that Dr. Wolf's testimony that 90% of sexual assault perpetrators are known by their victims "ran afoul of other authority which restricts the use of expert statistical estimates to corroborate an alleged child sex victim." Traverse at 16. But the cases he cites are distinguishable. In *People v. Julian*, the California Court of Appeal held that CSAAS "expert opinions on the statistical probability of guilt" are inadmissible because they may distract the jury and are irrelevant. *People v. Julian*, 34 Cal. App. 5th 878, 886 (2019), *as modified* (May 13, 2019). In *Julian*, the expert had testified that the percentage of false allegations in child sexual abuse cases ranges from 1% to 8%. *Id.* at 883. Similarly, in *People v. Lapenias*, the California Court of Appeal held that the expert testimony that it is "rare" for children to make false allegations of sexual abuse was inadmissible. *People v. Lapenias*, 67 Cal. App. 5th 162, 179 (2021), *as modified* (Aug. 17, 2021), *review denied* (Oct. 13, 2021). Here, Dr. Wolf did not opine

23

their victims.  *Id.* (citing Docket No. 29-15 ("11RT") at 1195, 1206–07).  Contrary to Mr. Vogt's contention, Dr. Wolf's testimony properly concerns the "general characteristics of victims" and was not used to opine that the witnesses were telling the truth.  *Brodit*, 350 F.3d at 991.  Thus, this case is distinguishable from *Snowden*, where the expert's testimony—that "99.5% of children tell the truth" and that the expert "had not personally encountered an instance where a child had invented a lie about abuse"—was linked to the expert's interviews with the child who was identified by the prosecution as a victim.  *Snowden*, 135 F.3d at 737–38.  The Eleventh Circuit concluded that such evidence is improper.  *Id.*  Here, Dr. Wolf did not testify about the specifics of the case, *see* 8RT at 605–61, and the jury instructions made clear that the CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him," CALCRIM No. 1191.

Furthermore, even if there was a constitutional error, Mr. Vogt has made no showing that alleged "error had a substantial and injurious effect on the verdict."  *Brecht*, 507 U.S. at 623.  During the defense counsel's cross-examination, Dr. Wolf admitted to the limitations and problems with CSAAS evidence.  8RT at 652–57.  For example, she agreed with defense counsel that there was no major organization that accepted CSAAS as a diagnosis and that there was no way to tell whether a child had been sexually abused by looking at or even interacting with the child.  *Id.* at 652–53.  Defense counsel also reiterated this to the jury during his closing argument.  *See* 11RT at 1222, 1228.  Additionally, as the state appellate court reasonably found, "[a]ny potential confusion about the use of the CSAAS evidence was addressed by the limiting instructions, which properly stated the law."  Ex. H at 32.  First, CALCRIM No. 332 instructed the jury that it was "not required to accept" expert testimony "as true or correct" and that it may "disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  Docket No. 29-1 ("2CT") at 334.[9]  Second, CALCRIM No. 1193 instructed the jury that "Miriam Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the

_____

on the statistical probability of how often children lie about being victims of sexual abuse.  She only opined that 90% of sexual assault perpetrators are known by their victims.

[9] "2CT" stands for Clerk's Transcript, volume 2.

United States District Court
Northern District of California

1   defendant committed any of the crimes charged against him."  It instructed the jury that it may

2   consider the evidence "only in deciding whether or not [J.A.]'s conduct was not inconsistent with

3   the conduct of someone who has been molested, and in evaluating the believability of her

4   testimony."  2CT at 321.  Therefore, even if there was a constitutional error from the admission of

5   CSAAS evidence—and there was not—it would not have had a substantial and injurious effect on

6   the verdict.

7       The Court **DENIES** Mr. Vogt's claim that the admission of CSAAS evidence violated his

8   due process rights.

9           b.    CSAAS Jury Instruction

10      Mr. Vogt also asserts that the use of CALCRIM No. 1193 violated his due process rights.

11  Pet. at 39.  As a preliminary matter, the parties dispute whether Mr. Vogt exhausted this claim.  A

12  federal court generally may not grant relief on an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1).

13  "Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either

14  the fact or length of their confinement are required first to exhaust state court remedies, either on

15  direct appeal or through collateral proceedings, by presenting the highest state court available with

16  a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court."

17  *Cardoza v. Hatton*, No. 16-CV-03666-EMC, 2017 WL 1493106, at *2 (N.D. Cal. Apr. 26, 2017).

18  Contrary to the Respondent's argument, Mr. Vogt has exhausted his CSAAS jury instruction claim

19  because he asserted this claim in his opening and reply briefs.  *See* Ex. E (Vogt opening brief on

20  direct appeal) at 118 (arguing that "the instruction could easily be construed in a manner

21  inconsistent with the rule that a CSAAS expert's testimony is not intended and should not be used

22  to determine whether the child's claim is true."); Docket No. 30-1, Ex. G (Vogt reply brief on

23  direct appeal) at 48.

24      That said, Mr. Vogt's claim fails because the state appellate court's decision that the

25  limiting instructions "properly stated the law" was not contrary to or involved an unreasonable

26  application of clearly established federal law as determined by the Supreme Court.  *See* 28 U.S.C.

27  § 2554(d).  CALCRIM No. 1193, the standard jury instruction regarding the permissible use of

28  CSAAS evidence, provides as follows:

United States District Court
Northern District of California

25

> You have heard testimony from Miriam Wolf regarding child sexual abuse accommodation syndrome.
>
> Miriam Wolf's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.
>
> You may consider this evidence only in deciding whether or not [J.A.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.

2CT at 321.  Mr. Vogt asserts that the instruction is "self-contradictory" because although it instructs the jury to not consider the CSAAS testimony as evidence that he had committed any of the charged crimes, it also instructs the jury to consider the testimony in deciding whether the victim's conduct was "not inconsistent" with that of a molested victim, *i.e.*, that the victim's conduct was consistent with that of a molested victim.  Pet. at 39.  He also asserts that the instruction improperly allowed the jury to use the CSAAS evidence "in evaluating the believability" of the victim's testimony, *i.e.*, the credibility of the victim.  *Id.*

However, Mr. Vogt has failed to show that the error "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  CALCRIM No. 1193 is consistent with California Supreme Court precedent as well as Ninth Circuit precedent—that CSAAS evidence can be used to counter any misconceptions about victim behavior but cannot be used as evidence that the victim experienced sexual abuse.  *See supra* Part IV.B.2.a.  The jury was not instructed to use the CSAAS evidence as proof that a crime had occurred or that the witnesses were telling the truth.  *See* 2CT at 321.  Although the instruction states that CSAAS evidence can be used to evaluate the "believability of [J.A.]'s testimony" this is consistent with the authority cited above allowing CSAAS evidence to counter misconceptions about victim behavior.  It is also not the same as generally instructing the jury that the CSAAS evidence can show that J.A. was telling the truth.  Answer at 25.  Further, a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  *Middleton*, 541 U.S. at 437. The other jury instructions undermine a conclusion that the CALCRIM No. 1191 constitutes a violation of due process.  They instruct that the prosecutor had the burden of proving its case "beyond a reasonable doubt" and that the jury does not have to accept an expert opinion as

26

true and accurate.  *See, e.g.*, Docket No. 29 ("1CT") at 300 (CALCRIM No. 220, which defines the reasonable doubt standard); 2CT at 334 (CALCRIM No. 332, which states that the jury does not have to accept an expert opinion as true).

Accordingly, the Court **DENIES** Mr. Vogt's claim of instructional error regarding CSAAS evidence.[10]  The Court will review Mr. Vogt's ineffective assistance of counsel claim regarding CSAAS evidence below.  *See infra* Part IV.D.1.

C.     Child Pornography Evidence

Next, Mr. Vogt challenges the evidence linking him to the Dell computer containing child pornography and intimate photographs of Jo.A.  Specifically, Mr. Vogt asserts a violation of due process by (1) the admission of child pornography as evidence of sexual intent and criminal propensity; (2) the presentation of allegedly "false testimony" by Wong, regarding the possession and control of the Dell computer; and (3) the prosecutor's failure to disclose its computer forensic expert Terence Wong's technical notes documenting his analysis of the Dell computer under *Brady v. Maryland*, 373 U.S. 83 (1963).

1.     Admission of Child Pornography Evidence

First, Mr. Vogt argues a violation of due process by the admission of child pornography as evidence of sexual intent and criminal propensity.  Pet. at 43–53.

a.     Background

At the beginning of trial, Judge Clifford Cretan ruled that the evidence of child pornography found on the Dell computer was admissible under Evidence Code sections 1101(b) and 1108.  Ex. H at 9–10.  The parties stipulated that the videos would not be played but that the jury would hear testimony regarding how the videos were discovered and would view the still photographs from the videos.  *Id.*  Later, defense counsel objected under Evidence Code section 352 to the prosecution's move to present the still photographs to the jury.  *Id.* at 10.  Judge Leland Davis noted that Judge Cretan had already ruled the evidence was admissible and that he

---

[10] Given the compelling evidence that was unrelated to the CSAAS, *see supra* Part IV.A.2, any constitutional error from either the CSAAs jury instruction or the admission of CSAAS evidence did not have a substantial and injurious effect on the verdict.  *Brecht*, 507 U.S. at 623.

United States District Court
Northern District of California

had exercised his independent discretion to disallow more than half of the photographs the prosecution initially sought to admit. *Id.* The trial court gave limiting instructions to the jury, CALCRIM No. 375 and CALCRIM No. 1191, explaining how the jury should consider the evidence of the uncharged offenses. *See supra* Part IV.A.

On direct appeal, the state appellate court rejected Mr. Vogt's argument that the trial court had erred in finding that the potential prejudice of the child pornography evidence did not substantially outweigh its probative value. Ex. H at 8–15. First, the state appellate court concluded that the evidence of child pornography was probative to show intent and because it had "some tendency in reason to show that the defendant is predisposed to engage in the conduct of the type charged." *Id.* at 11–12. In particular, the court relied on *People v. Menro*, 11 Cal.4th 786 (1995), where the California Supreme Court "found no abuse of discretion in the admission of pornographic magazines and photographs featuring young boys in the nude found in the defendant's possession because they 'yielded evidence from which the jury could infer that he had a sexual attraction to young boys and intended to act on that attraction.'" *Id.* at 12 (quoting *Menro*, 11 Cal.4th at 865). Similarly, in this case, the court held that the videos on the Dell computer, which "depicted sexual intercourse and oral copulation between adult males and young girls of similar ages to J.A., A.P. and Jo.A. at the time of the abuse" were "probative of defendant's sexual attraction to young girls and his intent to act on that attraction." *Id.*

The court also held that Mr. Vogt's reliance on *People v. Earle*, 172 Cal.App.4th 372 (2009) was unavailing. *Id.* In *Earle*, the court held that "a propensity to commit one kind of sex act cannot be supposed, without further evidentiary foundation, to demonstrate a propensity to commit a *different act*." *Earle*, 172 Cal.App.4th at 399 (emphasis in original). As a result, the court concluded that evidence of indecent exposure "was simply irrelevant to the assault charge, *i.e.*, it had no tendency *in reason* to show that he committed the latter offense." *Id.* at 400 (emphasis in original). In this case, the state appellate court distinguished *Earle* because there was "sufficient evidentiary foundation to demonstrate his criminal propensity to commit the charged crimes against these victims." Ex. H at 13. The "similarities between the charged offenses and the sexual conduct depicted in the child pornography videos, along with the evidence of

28

defendant's efforts to obtain nude and intimate photographs of the victims"—*e.g.,* Mr. Vogt had "solicited nude photographs from J.A. and A.P., stole intimate photographs of Jo.A., and surreptitiously photographed Jo.A. and K.A. while they were in the shower"—provided sufficient evidentiary foundation. *Id.* at 12–13. The court also held that there was sufficient nexus between the child pornography videos and the charged offenses because "J.A. testified that defendant watched pornography videos on the Dell computer while molesting her," thus "the child pornography and pornography videos used in the commission of the charged offenses were traced to the same computer." *Id.* at 13.

Second, the court concluded that the evidence of child pornography videos was not stronger and more inflammatory than the charged acts. *Id.* Although the videos were "obviously disturbing," "they were not more inflammatory than the charged offenses against J.A., which involved dozens of instances of rape, oral sex, and threats to kill J.A. that began when she was 5-years-old." *Id.* Moreover, the court held that the evidence was not stale in time because the videos remained on the computer at the time of defendant's arrest and were saved in April, June, and August of 2009 "while the abuse of J.A. was ongoing or just coming to an end, and while defendant was engaged in lewd acts with A.P. and Jo.A." *Id.* at 14.

Third, the court held that the jury was not likely to be confused or distracted from the main inquiry because the "charged offenses involved discrete acts committed against the testifying victims," which are "easily distinguishable from the separate issue of defendant's possession of child pornography videos." *Id.* The court acknowledged that "the jury could have been tempted to punish defendant for the uncharged offense of possessing child pornography," but it could not conclude that "this potential prejudice substantially outweighed the probative value of the evidence." *Id.* Finally, the court held that the "trial court exercised reasonable discretion in limiting the presentation" of the child pornography evidence to minimize prejudice as the testimony "involved only 2 of the 21 witnesses and occupied only 26 pages of a large, 15-volume trial transcript." *Id.* The court ultimately concluded that the trial court acted within its discretion when it admitted the child pornography evidence to prove Mr. Vogt's sexual intent and criminal propensity. *Id.* at 15.

1       b.    Analysis

2       To obtain federal habeas relief for an error in the admission of challenged evidence, a

3   petitioner must show that the error "so infused the trial with unfairness as to deny due process of

4   law." *Estelle*, 502 U.S. at 75 (1991).  The admission of prejudicial evidence may make a trial

5   fundamentally unfair and violate due process "[o]nly if there are *no* permissible inferences the jury

6   may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)

7   (emphasis in original).  "Even then, the evidence must 'be of such quality as necessarily prevents a

8   fair trial.'  Only under such circumstances can it be inferred that the jury must have used the

9   evidence for an improper purpose." *Id*.  Here, the state court's decision was not contrary to, or an

10  unreasonable application of, clearly established federal law, or involved an unreasonable

11  determination of the facts considering the evidence presented in the state court proceeding.  *See* 28

12  U.S.C. § 2554(d).

13      In Mr. Vogt's view, the "admission of irrelevant and highly inflammatory evidence," such

14  as the child pornography evidence was a violation of due process.  Traverse at 19.  He asserts that

15  the evidence is irrelevant because the possession of child pornography is not correlated with the

16  commission of contact sex offenses.  *Id*.  But the state appellate court concluded that the evidence

17  was relevant for the purposes of showing intent under California Evidence Code section 1101(b)

18  and propensity under section 1108.  Ex. H at 10–15.  Section 1101(b) allows the "admission of

19  evidence that a person committed a crime . . . when relevant to prove some fact," such as intent,

20  but not to prove a person's "disposition to commit such an act."[11]  Cal. Evid. Code § 1101(b).

21  Section 1108, however, allows evidence of the defendant's commission of another sexual offense

22  to prove criminal disposition or propensity in cases in which the defendant is accused of a sexual

23  offense, if the evidence is not inadmissible pursuant to Section 352.  *Id*. § 1108(a); *People v.*

24  *Falsetta*, 21 Cal. 4th 903, 911 (1999).  Section 352 recites, a "court in its discretion may exclude

25  evidence if its probative value is substantially outweighed by the probability that its admission

26

27  [11] To establish the charges of lewd and lascivious acts with minors and the charge of sending or
    exhibiting harmful matter to a minor, the prosecution had to prove that Mr. Vogt committed these
28  acts with the intent of arousing, appealing to, or gratifying his or the minor's lust, passions, or
    sexual desires.  Answer at 39 (citing Cal. Pen. Code §§ 288(a),(c), 288.2(a)).

United States District Court
Northern District of California

will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." *Id.* § 352.  In order to find constitutional error, the Court must find that there were no permissible inferences under both theories.  *See Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (denying an ineffective assistance of counsel habeas claim where the evidence would have been admitted to show common plan or intent under section 1101(b) even if it were excluded under section 1108).

The state appellate court's conclusion is reasonable because the admission of the child pornography evidence was properly admitted to show intent and propensity to commit the charged crimes.  Mr. Vogt asserts that "the propensity to possess child pornography is not the same as propensity to commit a lewd and lascivious act."  Pet. at 50–51.  His reliance on *People v. Earle*, however, is misplaced as reasonably explained by the state appellate court.  Ex. H at 12–13. Moreover, the other cases on which Mr. Vogt relies are also distinguishable.  For example, he asserts that the state appellate court decision was contrary to the U.S. Supreme Court's decision in *Paroline v. United States*, 572 U.S. 434 (2014), which limited the admissibility of child pornography evidence.  Pet. at 44–45.  But Mr. Vogt misinterprets *Paroline*.  *Paroline* examined how to determine "the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed."  *Paroline*, 572 U.S. at 439.  The U.S. Supreme Court held that restitution is proper only to the extent the defendant's offense proximately caused a victim's loss.  *Id.* at 448.  Traverse at 19.  *Paroline* does not support Mr. Vogt's contention that the possession of child pornography is irrelevant to the commission of contact sex offenses.  Traverse at 19.

Similarly, *United States v. Sumner*, 119 F.3d 658 (8th Cir. 1997) and *United States v. Roberts*, 88 F.3d 872 (10th Cir. 1996) are distinguishable because they do not "discuss whether possession of child pornography is relevant to a defendant's disposition to commit sexual assault on a child."  Answer at 37.  In *Sumner*, the Eighth Circuit concluded that the district court erred in admitting evidence regarding two prior incidents in which the defendant sexually assaulted girls under the age of fourteen because the evidence "does no more than show that [defendant] has 'a propensity to commit crimes, which Rule 404(b) prohibits.  *Sumner*, 119 F.3d at 660.  But under

31

1   California law, other evidence of sexual abuse can be used to show propensity in sexual abuse

2   cases. Cal. Evid. Code § 1108. In *Roberts*, the Tenth Circuit remanded the issue of admitting

3   evidence that defendant sexually abused nine other women over the past twenty years for a

4   hearing to determine whether the government has established the defendant engaged in a common

5   scheme to sexually abuse women. *Roberts,* 88 F.3d at 875. Here, the state appellate court held

6   that the child pornography evidence was relevant for the purposes of establishing lewd intent and

7   propensity, not a common scheme or plan. Ex. H at 12–13.

8        Likewise, *People v. Soto*, 64 Cal.App.4th 966 (1998) is distinguishable because it does not

9   concern the admission of child pornography evidence. However, *Soto* otherwise supports the state

10  appellate court's conclusion in this case. In *Soto*, the California Court of Appeal held that the trial

11  court properly admitted evidence of prior sexual conduct by the defendant involving his sister and

12  a niece in a case where defendant was charged for lewd and lascivious conduct with a child under

13  14 years of age, another niece. *Soto*, 64 Cal.App.4th at 991–92. The court held that the

14  prejudicial effect of the evidence did not outweigh the probative nature because the evidence

15  involved similar conduct to the charged offense with victims within the same age range as the

16  victim in the case. *Id.* Likewise, in this case, the child pornography evidence involved similar

17  conduct to the charged offenses. The child pornography depicted sex acts with young girls

18  approximately the same age as J.A. when Mr. Vogt molested her. Answer at 36. And the videos

19  were created in 2009, while the abuse of J.A. was either ongoing or just coming to an end, and

20  while Mr. Vogt was engaged in lewd acts with A.P. and Jo.A. *Id.* Thus, the state appellate court

21  reasonably concluded that the "similarities between the charged offenses and the sexual conduct

22  depicted in the child pornography videos, along with the evidence of defendant's efforts to obtain

23  nude and intimate photographs of the victims" provided sufficient foundation to show that the

24  propensity to possess child pornography is the same as the propensity to commit a lewd and

25  lascivious act with or assault of a minor. Ex. H at 12–13.

26       Mr. Vogt also relies on the testimony of Dr. Avak Howsepian from his motion for a new

27  trial to argue that there is "[n]o known credible significant correlation" between the viewing of

28  child pornography and commission of contact sex offenses. Pet. at 52 (citing 13RT at 1420). But

United States District Court
Northern District of California

1    Dr. Howsepian also testified that there was at least one study suggesting a correlation between

2    viewing child pornography and pedophilia and that there was a correlation between pedophilia or

3    pedophilic disorder and child sexual offenses.  13RT at 1424, 1432–34.  He also acknowledged a

4    study that found that 82% of contact sexual offenders had abused a child sexually prior to having

5    possessed child pornography.  *Id.* at 1427.  Respondent contends that Mr. Vogt committed his acts

6    of sexual abuse on J.A. prior to any evidence of him possessing child pornography is significant

7    considering this study.  Answer at 38.  Dr. Howsepian also opined that someone who had

8    expressed sexual interest in girls 18 or younger would be more likely to possess child pornography

9    than someone who had not.  13 RT at 1430.  Thus, Dr. Howsepian's testimony does not contradict

10   the state appellate court's conclusion that possession of child pornography was evidence of

11   propensity and lewd intent.[12]

12   Further, Mr. Vogt asserts that the child pornography evidence was irrelevant because there

13   "was insufficient foundation to connect" him to it.  Pet. at 43.  But the record does not support this

14   claim.  Melissa testified that Mr. Vogt was usually the only one who would use the Dell computer

15   where the child pornography was found, and J.A. had never seen anyone other than Mr. Vogt use

16   the computer.  7RT at 515; 8RT at 731.  Although Jo.A. testified that she would sometimes use the

17   computer, 7RT at 390–94, and Wong testified that he could not determine who "controlled" the

18   computer, 9RT at 885–86, Wong testified that "most" or a "majority" of email activity found on

19   the Dell computer was attributable to Mr. Vogt.  13RT at 1405.  And as explained below, the

20   Court rejects Mr. Vogt's arguments that the prosecution engaged in misconduct or that there were

21   other errors in linking the child pornography to him.  *See infra* Parts IV.C.2–3, IV.D.2–3; Ex. H at

22   13.

23   Finally, the probative value of the possession of child pornography outweighed any

24   prejudicial effect.  Cal. Evid. Code § 352.  As the state appellate court reasonably held, the child

United States District Court
Northern District of California

---

[12] Mr. Vogt also asserts that Dr. Howsepian's testimony that there is a correlation between domestic violence and the commission of child sex offenses, 13 RT at 1420, could have been a "basis for doubt [about] whether the proper person was accused" because "Keith Addison had a history of domestic violence."  Traverse at 18.  To the contrary, the testimony is irrelevant because there was no sufficient evidence that Keith Addison had a history of domestic violence.  *See infra* Part IV.D.4.

1    pornography evidence was less inflammatory than J.A.'s testimony that Mr. Vogt repeatedly

2    molested her since she was five or six years old until she was 13.  Ex. H at 13–14.  Mr. Vogt's

3    other arguments concern the alleged prejudice from the lowered standard of proof to the "other

4    crimes" evidence and the admission of CSAAS testimony, which the Court rejects above.  *See*

5    *supra* Part IV.C.3.  Accordingly, the state court reasonably found Mr. Vogt's due process rights

6    were not violated by the admission of the challenged evidence.

7           The Court **DENIES** Mr. Vogt's claim regarding the admissibility of the child pornography

8    evidence.  The Court will review Mr. Vogt's ineffective assistance of counsel claim regarding

9    CSAAS evidence below.  *See infra* Part IV.D.2.

10                2.     ICon  False Testimony by Prosecution's Computer Expert

11          Next, Mr. Vogt asserts a violation of his due process rights by the presentation of allegedly

12   "false testimony" by Wong, regarding the possession and control of the Dell computer.  Pet. at

13   65–67.  To establish a due process violation based on the government's use of false or misleading

14   testimony, Mr. Vogt must show that "(1) the testimony (or evidence) was actually false, (2) the

15   prosecution knew or should have known that the testimony was actually false, and (3) that the

16   false testimony was material."  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)

17   (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269–71 (1959)).  A new trial is required if

18   "the false testimony could . . . in any reasonable likelihood have affected the judgment of the

19   jury."  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  But a new trial is not automatically

20   required "whenever a combing of the prosecutors' files after the trial has disclosed evidence

21   possibly useful to the defense but not likely to have changed the verdict."  *Id.* (internal quotation

22   marks omitted).

23                a.     Background

24          During trial, the prosecution's computer forensic expert Terence Wong "testified that

25   during his examination of the Dell computer, he determined the email account for

26   'kyle2002@yahoo.com' was 'the most frequent used e-mail' on that computer because he 'saw

27   many in-boxes for that e-mail address . . . the majority of them were for that e-mail address.'"  Ex.

28   H at 18.  "On cross-examination, Wong acknowledged that he saw other email addresses on the

United States District Court
Northern District of California

United States District Court
Northern District of California

computer but did not do a statistical analysis and could not conclusively say who controlled the computer." *Id.* The only discovery obtained by Mr. Vogt's trial counsel concerning the Dell computer "was a three-page report by Wong and copies of the still photographs that the prosecution intended to present at trial." *Id.* at 19. Wong stated in his report that, at Detective Chetcuti's request, he searched the contents of the Dell computer only for "1. Suspect's email address. 2. Communication between the suspect and the victim(s). 3. Child pornography, including photos of the victim." *Id.* Although the prosecutor invited Mr. Vogt's trial counsel "to obtain a mirror image of the computer contents," he declined. *Id.*

In addition, Melissa testified that Mr. Vogt was "usually" the only user of the Dell computer, but the computer was not password protected and others could use it. *Id.* J.A. and K.A. also testified that they did not see anyone using the computer other than Mr. Vogt. *Id.*

After the verdicts, Mr. Vogt's new counsel "consulted with an expert in forensic computer analysis, Samuel Plainfield, who reviewed a copy of the Dell computer hard drive." *Id.* In support of Mr. Vogt's motion for new trial, Plainfield "found that the email address kyle2002@yahoo.com did not appear at all on the Dell computer" and instead he found a different email address for Mr. Vogt, "kvogt2002@yahoo.com." *Id.* He testified that he did not see email inboxes or outboxes (referring to standalone email programs such as Microsoft Outlook) for the kvogt2002@yahoo.com address and he "did not recollect seeing any composed emails either to or from an email address associated with 'KVogt.'" *Id.* However, Plainfield admitted that he was only looking for "something related to e-mails in 2009" so if he had found some emails outside of 2009, he "didn't take much note of them." *Id.* Moreover, Plainfield's analysis of the computer resulted in 428,741 "hits" (a particular text string in the hard drive) for the name "Kyle" and found some folders on the desktop associated with the name Kyle, including a folder that appeared to contain music files. *Id.* Plainfield also found evidence that other people used the computer in 2009—"evidence of purchases linked to J.A. and Keith, entries linked to Yahoo profiles for various persons including Antonio, J.A. and Jo.A., hits for [] various names including Jo.A., Keith, and J.A., and documents such as Keith's resume and a school paper written by Jo.A." *Id.* But the data did not show who had downloaded or viewed the child pornography videos, which

had been downloaded through a program called Limewire into a folder with no associated username. *Id.* at 19–20.

In opposition to Mr. Vogt's motion for new trial, Wong reviewed the Dell computer's data again, determined that he had mistakenly transcribed the email address in his report, and confirmed that the correct email was kvogt2002@yahoo.com. *Id.* at 20. Wong testified that he discovered 22 more files containing suspected child pornography in a folder entitled "Limewire Saved." *Id.* "Wong also found additional information indicating defendant's use of the Dell computer between April and August 2009." *Id.* For example, one desktop folder entitled "KYLE'S IPOD MUSIC! DO NOT DELETE!!!!!" contained music files from November 2008 and November 2009. *Id.* He testified that the "Limewire Saved" folder, which contained the pornography videos, also contained "over 2,000 music files, some of which were duplicates of files found in the desktop music folder bearing defendant's name." *Id.* In addition, Wong used "forensic software and a web page editor to partially retrieve a web-based email inbox for an address for 'Kyle' containing 105 emails," including 7 emails from February 2009. *Id.* He "saw other inboxes for defendant, 82 Craigslist entries from March 2009, and 'flash cookies' from Facebook for 'Kyle Vogt' created in June and August 2009." *Id.*

The trial court denied Mr. Vogt's motion for a new trial in part because there was no prejudice to defendant." *Id.* at 20. The trial court held that "Plainfield did not exclude him as the person most responsible for the child pornography, and Plainfield's testimony would not have overcome the 'extremely credible' and 'compelling' testimony of the prosecution witnesses, specifically, Jo.A., J.A. and A.P." *Id.* Likewise, the state appellate court rejected Mr. Vogt's false testimony claim for the reasons below. Ex. H at 26–27.

b.   Analysis

The state appellate court's rejection of Mr. Vogt's false testimony claim was not contrary to, or an unreasonable application of, clearly established federal law, or involved an unreasonable determination of the facts considering the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2554(d). The state appellate court reasonably found that the record did not support Mr. Vogt's contention that Wong's testimony was knowingly or materially false. Ex. H at 26.

"Wong's reference to the kyle2002@yahoo.com email address was a mistake based on a transcription error in his report discovered after trial during the new trial motion proceedings." *Id.* Although such a mistake "made [Wong's] methodology vulnerable to criticism," the court held that it did not support the inference that Wong had fabricated the results or concealed information in a materially misleading way. *Id.* Further, Mr. Vogt did not claim that the prosecutor knew or should have known of this mistake before or during trial. *Id.*

The court acknowledged that Mr. Vogt's defense computer forensic expert, Plainfield reached a different conclusion than Wong, but such differences could be explained by differences in methodology or forensic software. *Id.* For example, Wong testified that he saw many inboxes for Mr. Vogt's email address but did not do any statistical analysis to determine that it was used the most. 9RT at 885. Instead, he determined that Mr. Vogt's email was the most used address on the computer based on his review of the html or web files on the computer using forensic software. *Id.* at 884–85. In contrast, Plainfield testified that he did not see any standalone inboxes or outboxes for Mr. Vogt's email address, but his analysis focused only on 2009. 13RT at 1405. Notably, Plainfield's testimony was consistent with Wong's findings, *i.e.*, that "most" or a "majority" of email activity found on the Dell computer was attributable to Mr. Vogt. *Id.* Plainfield testified that he found 428,741 hits for "Kyle" compared to just 8,671 hits for "Jo.A.," the next most frequent term, and 1,142 hits for Keith. 13RT at 1374, 1376–77, 1405.

Therefore, the court reasonably concluded that Mr. Vogt had not shown that Wong's testimony was false. The Court **DENIES** Mr. Vogt's false testimony claim.

3. *Brady* Error Claim

Finally, Mr. Vogt asserts a violation of his due process rights as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963), for the prosecutor's failure to disclose its computer forensic expert Wong's technical notes documenting his analysis of the Dell computer. Pet. at 62–64. Mr. Vogt argues that the technical notes showed that Wong was careless and that he was predisposed to conclude that it was Mr. Vogt and not Keith Addison, Jo.A.'s father, who had accessed the child pornography. *Id.* at 64. Had the notes been disclosed, Mr. Vogt asserts that it would have diminished Wong's credibility and there would have been no "convincing evidence linking [Mr.

Vogt] to the possession of child pornography, the victim's testimony would have lacked corroboration, and the conviction would not have occurred." *Id.* at 62.

A *Brady* violation occurs when the prosecution fails to turn over favorable material evidence to the defense. *See Brady*, 373 U.S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted). By "a reasonable probability," the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. A "reasonable probability" is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).

        a.   <u>Background</u>

The relevant background is explained above. *See supra* Part IV.C.2.a. For the purposes of this issue, the following information is also relevant. After the conclusion of testimony on the new trial motion, Mr. Vogt moved to compel production of Wong's technical notes. Ex. H at 19. The prosecutor told the trial court that she had advised defense counsel that "she did not have any such notes, she had not seen them, and she believed the notes could only be obtained by a request to the FBI." *Id.* But "Wong was able to produce the technical notes to the defense counsel the following day." *Id.*

The state appellate court concluded that "there was no constitutional or statutory error by the prosecution in this case because the technical notes were not exculpatory or favorable to the

defense within the meaning of *Brady* . . . ."  Ex. H at 24.  On direct appeal, Mr. Vogt asserted that the technical notes would have shown that Wong never found any trace of an email address for "kyle2002@yahoo.com."  Ex. G at 24.  Wong's technical notes stated that "kvogt2002@yahoo appears to the [sic] Kyle Vogt's email address."  *Id.*; 4RT at 1046.  The court acknowledged that the "most significant aspect of the technical notes was that they revealed an error in Wong's final report as to the precise email address he attributed to defendant," *i.e.*, Wong's typographical error referring to "kyle2002@yahoo.com" instead of "kvogt2002@yahoo.com."  *Id.* at 25.  But the court concluded that "this transcription error did not alter the substance of Wong's testimony that he found many instances of an email address associated with defendant on the Dell computer."  *Id.*

Further, the court held that it was "immaterial that the technical notes showed Wong's failure to document any other email addresses appearing on the Dell computer" because Mr. Vogt's counsel "was already aware of the limited nature of Wong's examination from his report" and counsel "elicited Wong's testimony that he saw other email addresses on the computer but did not make note of them."  *Id.*  The court also rejected Mr. Vogt's argument that the notes showed Chetcuti's bias because of Chetcuti's instruction to Wong—that "the computer was only accessed by the suspect, so any suspicious images are relevant."  *Id.*; Docket No. 29-3 ("4CT") at 1047.  The court held, "this remark simply reflected Chetcuti's view of the scope of the search for child pornography" and "did not stop Wong from examining the Dell to see if defendant's email address was the most frequently used, compared to others."  Ex. H at 25.

The court also concluded that although "the technical notes could have been used to make Wong appear careless and less credible, this would not have likely changed the outcome of the case" because "on redirect, Wong would have simply clarified the correct email address and then taken the same position as before that the majority of email activity found on the Dell computer was attributable to defendant."  *Id.*  Moreover, it recognized that "[e]ven without the technical notes, Wong's examination was vulnerable to attack (and was, in fact, attacked) for not thoroughly documenting the other users of the computer."  *Id.*  The court summarily rejected Mr. Vogt's *Brady* error claim.  *Id.*

1          b.      Analysis

2          The state court's rejection of Mr. Vogt's *Brady* error claim was not contrary to, or an

3    unreasonable application of, clearly established federal law, or involved an unreasonable

4    determination of the facts considering the evidence presented in the state court proceeding.  *See* 28

5    U.S.C. § 2554(d).  In his petition, Mr. Vogt asserts that "Wong was careless and predisposed to

6    conclude that it was the defendant, and not Keith Addison, who accessed the child pornography."

7    Pet. at 64.  But the state court reasonably concluded that Wong's error was not exculpatory

8    because it did not change the main point of his testimony—that most of the activity found on the

9    Dell computer was attributable to Mr. Vogt.  Ex. H at 25.  The court also reasonably held that even

10   if Wong's notes had been produced and admitted, on redirect Wong would have clarified the

11   correct email and taken the same position.  *Id.*

12         Mr. Vogt also asserts that the state appellate court "improperly minimizes the effect" of the

13   communication between Detective Chetcuti and Wong—*i.e.*, Chetcuti's instruction that the

14   computer "was only accessed by the suspect, so any suspicious images are relevant."  Pet. at 65.

15   He argues that this communication undermines the credibility of Wong's findings because Mr.

16   Vogt was not in fact the only person to access the computer.  *Id.*  However, Wong never testified

17   that Mr. Vogt was the only person to access the computer; he admitted that he could not say who

18   controlled the computer.  9RT at 885–86.  The notes were immaterial given the weaknesses in

19   Wong's investigation.  His final report states that Chetcuti had requested only a search of the

20   computer for Mr. Vogt's email address, communication between Mr. Vogt and the victim(s), and

21   child pornography including photos of the victim.  *See* Docket No. 29-2 ("3CT") at 649.  And

22   during cross-examination, Wong admitted that he was aware of the limited nature of his analysis,

23   *e.g.*, he saw other email addresses that were not Mr. Vogt's, but did not make note of them.  *See*

24   9RT at 883–87.  Thus, the state appellate court reasonably concluded that the communication

25   between Chetcuti and Wong in Wong's technical notes was immaterial because it "simply

26   reflected Chetcuti's view of the scope of the search for child pornography."  Ex. H at 25.

27         Finally, Mr. Vogt asserts that Wong's notes show that his trial testimony "exaggerated the

28   number of hits or contacts attributable to Mr. Vogt" and therefore "the number of hits is not

40

United States District Court
Northern District of California

1    enough to attribute the child pornography" to him or to exclude Keith Addison as a potential

2    suspect.  Traverse at 23.  He admits that Plainfield stated that an indexed search for an email

3    address with Keith's name resulted in 112 hits in 29 files, whereas an indexed search for

4    "kvogt2002" resulted in 228 hits in 43 files.  Ex. H at 26–27.  However, Mr. Vogt asserts that

5    "[a]lthough that number is roughly twice the number of hits attributable to Keith Addison, the

6    numbers are in the same order of magnitude."  Traverse at 23.  But as explained above, the

7    discrepancies between Plainfield and Wong's findings do not necessarily mean that Wong

8    "exaggerated the number of hits" attributable to Mr. Vogt.  *See supra* Part IV.C.2.b.  Further, Mr.

9    Vogt's own expert, Plainfield, testified that he found 428,741 hits for "Kyle" compared to 1,142

10   hits for Keith.  13RT at 1374, 1376–77, 1405.  Therefore, the state court reasonably concluded that

11   evidence of the technical notes was neither exculpatory nor material or that the failure to disclose

12   the technical notes prejudiced Mr. Vogt.

13           The Court **DENIES** Mr. Vogt's *Brady* claim.[13]

14   D.      Ineffective Assistance of Counsel

15           Mr. Vogt argues a violation of his right to effective counsel on the grounds that his trial

16   counsel (1) failed to object to the CSAAS jury instruction and present contradictory CSAAS

17   expert testimony, (2) failed to properly object to child pornography evidence, (3) failed to consult

18   with and present the testimony of a defense forensic computer expert, and (4) failed to impeach

19   two witnesses and call one witness; and that (5) his appellate counsel failed to consistently

20   advance federal constitutional claims and cite relevant federal authorities.

21           The Sixth Amendment's right to counsel guarantees not only assistance, but effective

22   assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

23   judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

24

25   _____

     [13] Mr. Vogt also argues that the prejudice from the *Brady* error was cumulative to the other errors
26   associated with the computer analyst and to the admissibility of child pornography evidence.  But
     because the Court rejects his other arguments, there is no such cumulative error.  *See* Parts IV.C;
27   IV.D.2–3. And given the compelling evidence that was unrelated to the child pornography
     evidence, see supra Part IV.A.2, any constitutional error from either the admission of the evidence,
28   Wong's testimony, or the failure to disclose Wong's notes, did not have a substantial and injurious
     effect on the verdict.  *Brecht*, 507 U.S. at 623.

United States District Court
Northern District of California

1    functioning of the adversarial process that the trial cannot be relied upon as having produced a just

2    result.  *Id.*  To prevail on an ineffective-assistance-of-counsel claim, the petitioner must establish

3    two things.  First, he must demonstrate that counsel's performance was deficient and fell below an

4    "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687–88.  There

5    is a "strong presumption that counsel's conduct falls within the wide range of reasonable

6    professional assistance."  *Id.* at 689.  Second, he must establish that he was prejudiced by

7    counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's

8    unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A

9    reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

10   A "doubly deferential" judicial review is appropriate in analyzing

11   ineffective-assistance-of-counsel claims under § 2254.  *Cullen v. Pinholster*, 563 U.S. 170, 202

12   (2011).  The "question is not whether counsel's actions were reasonable.  The question is whether

13   there is any reasonable argument that counsel satisfied Strickland's deferential standard."

14   *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

15   Here, the state appellate court's rejection of Mr. Vogt's ineffective-assistance–of-counsel

16   claims were not contrary to, or an unreasonable application of, clearly established federal law, or

17   involved an unreasonable determination of the facts considering the evidence presented in the state

18   court proceeding.  *See* 28 U.S.C. § 2554(d).

19       1.   Failure of Trial Counsel to Object to CSAAS Jury Instruction and Present

20            Contradictory CSAAS Expert Testimony

21   Mr. Vogt asserts that his trial counsel was ineffective for failure to object to the challenged

22   CSAAS instruction and failure to present contradictory CSAAS expert testimony.  Pet. at 40–43.

23   But first, the parties dispute whether Mr. Vogt exhausted his claim about the failure to object to

24   CSAAS jury instruction.  A federal court generally may not grant relief on an unexhausted

25   claim.  *See* 28 U.S.C. § 2254(b)(1).  Because Mr. Vogt has failed to assert this claim, the Court

26   cannot grant relief on this claim.  *See* Ex. E (Vogt opening brief on direct appeal) at 115–19; Ex. G

27   (Vogt reply brief on direct appeal) at 44–48.

28   However, "a federal court may deny an unexhausted petition on the merits only when it is

42

United States District Court
Northern District of California

1   perfectly clear that the applicant does not raise even a colorable federal claim," as is the case here.

2   *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  As explained above, there is no harm from

3   the CALCRIM No. 1193 instruction as it was properly given, and therefore, Mr. Vogt's defense

4   counsel cannot be found deficient for not raising a meritless objection.  *See supra* Part IV.B.2.b;

5   *Martinez v. Ryan*, 926 F.3d 1215, 1226 (9th Cir. June 18, 2019) (holding that the "[f]ailure to raise

6   a meritless argument does not constitute ineffective assistance.").  Moreover, Respondent points

7   out that defense counsel "could have made the reasonable tactical decision that CALCRIM No.

8   1193 *should* be given, because the instruction made clear that CSAAS evidence was 'not evidence

9   that the defendant committed any of the crimes charged against him.'"  Answer at 26.  There is

10  also no demonstration of prejudice based on the failure to object.  In order to prevail on a claim of

11  ineffective assistance of counsel, the petitioner must "affirmatively prove prejudice," *Strickland*,

12  466 U.S. at 693, and the "likelihood of a different result must be substantial, not just conceivable."

13  *Richter*, 52 U.S. at 112.  Given the strong evidence against Mr. Vogt, *see supra* Part IV.A.2, there

14  is no reasonable likelihood that Mr. Vogt would have obtained a more favorable result at trial if

15  defense counsel had raised an objection.

16          Mr. Vogt also asserts that his trial counsel was ineffective for not presenting the testimony

17  of his own expert, Dr. Annette Ermshar, to contradict the testimony of Dr. Wolf.  Pet. at 40–43.

18  During his motion for a new trial, Dr. Ermshar testified the following:

19              [Dr. Ermshar] opined that CSAAS is not a useful or relevant tool in
                legal proceedings and can unduly influence jurors.  Dr. Ermshar
20              stated that CSAAS is not generally accepted by the psychological
                community as a diagnosis.  She further testified that CSAAS
21              summarized one man's observations from over 30 years ago based
                on a very narrow population of confirmed, known victims of sexual
22              abuse, so the fact of abuse was not being tested, and it was written
                for advocacy and clinical purposes, not legal proceedings.  Dr.
23              Ermshar opined that using CSAAS in a legal proceeding unduly
                influences the jury members into the perception that it has an
24              artificial scientific weight.  Dr. Ermshar further opined that the
                CSAAS factors are not predictive, not correlative, and can be seen in
25              children who have never been abused.  Dr. Ermshar and another
                psychologist, Dr. Diana Everstine, also provided information as to
26              why children can be unreliable reporters, as their memories can be
                distorted by suggestive questioning, influence by authority figures,
27              interview bias, and childhood trauma.

28  Ex. H at 29.

United States District Court
Northern District of California

1   The state appellate court's application of *Strickland* in rejecting Mr. Vogt's claim was

2   reasonable.  Under the first *Strickland* factor, the state court concluded that Mr. Vogt failed to

3   show deficient performance under an objective standard of professional reasonableness.  Ex. H at

4   32.  It acknowledged that "the record sheds no light" on why Mr. Vogt's trial counsel failed to

5   present an expert to rebut Dr. Wolf's testimony.  *Id.*  "[U]nless counsel was asked for an

6   explanation and failed to provide one, or unless there simply could be no satisfactory explanation,

7   these cases are affirmed on appeal."  *People v. Pope*, 23 Cal.3d 412, 426 (1979), *overruled in part

8   on other grounds in People v. Berryman*, 6 Cal.4th 1047, 1081 n.10 (1993).  Similarly, where the

9   record is silent, federal judges cannot "so casually second-guess the decisions of their state-court

10  colleagues or defense attorneys."  *Burt v. Titlow*, 571 U.S. 12, 15 (2013).  "[T]he absence of

11  evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide

12  range of reasonable professional assistance."  *Id.* at 23.  There are at least two conceivable reasons

13  as to why Mr. Vogt's counsel did not call Dr. Ermshar.  As the government theorizes, "[i]t is

14  possible that defense counsel did not want to focus the jury's attention on the credibility of the

15  complaining witnesses, but to instead focus on what was missing from the prosecution's case.  It is

16  also possible that defense counsel made the reasonable determination that he could discredit

17  Wolf's testimony through cross-examination so that calling his own expert was unnecessary."  Ex.

18  F (Respondent brief) at 92.  These reasons undercut Mr. Vogt's argument that his trial counsel was

19  deficient under the first *Strickland* factor.  *See Washington v. Shinn*, 21 F.4th 1081, 1093 (9th Cir.

20  2021) (rejecting *Strickland* claim and noting that "[w]e have . . . recognized the wide latitude to be

21  given to counsel's tactical choices").

22  Mr. Vogt contends that because his trial counsel "made no effort to inform himself of what

23  an opposing expert would say, there was no basis for a tactical decision to not present the expert's

24  testimony."  Pet. at 41.  Mr. Vogt relies on *Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017), to

25  assert that this constitutes ineffective assistance of counsel but the case is distinguishable.  In

26  *Weeden*, the defendant's trial counsel explained that he had contemplated seeking a psychological

27  evaluation of the defendant but did not do so because "regardless of what the doctor would have

28  concluded, it would be inconsistent with the defense" that he was putting forth.  *Weeden*, 854 F.3d

44

at 1068.  The state appellate court decided that defendant's trial counsel provided effective representation because his choice to not investigate "was a sound 'tactical decision'" due to fears "that the results of an expert evaluation might undermine his trial strategy."  *Id.* at 1070.  The Ninth Circuit held that the state appellate court misapplied *Strickland* because the state appellate court "did not identify any 'reasonable decision' made by [defendant's] trial counsel that rendered an investigation of psychological evidence 'unnecessary.'"  *Id.*  The court explained that defendant's counsel "could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal."  *Id.*  The Ninth Circuit held that "[c]ounsel cannot justify a failure to investigate simply by invoking strategy."  *Id.*

In this case, Mr. Vogt asserts that his trial counsel was ineffective because without knowing what an opposing CSAAS expert would say, he could not have made a reasonable tactical decision to not present opposing CSAAS expert testimony.  Pet. at 41.  This case, however, is distinguishable because unlike in *Weeden*, there is no record on why Mr. Vogt's trial counsel failed to present expert testimony.  Mr. Vogt's ineffective-assistance-of-counsel expert, Geoffrey Carr, testified that he saw no record of Mr. Vogt's trial counsel having hired a CSAAS expert or child psychology expert, which violated the standard of care "to solicit an opinion from someone to see if that would be relevant and/or important testimony for the case" in a case where the prosecution was to put on a CSAAS expert.  14RT at 1469.  But Carr admitted that he had not spoken to defense counsel, so he did not know what he had or had not done.  14RT at 1483, 1500.  Thus, this case is more akin to *Gentry v. Sinclair*, 705 F.3d 884 (9th Cir. 2013), where the Ninth Circuit held that it was "not unreasonable for the Washington Supreme Court to conclude that trial counsel's performance was not deficient when [defendant] had no evidence to indicate why the failure to present evidence of [his] psychological condition was unreasonable under the circumstances."  *Gentry*, 705 F.3d at 899–900.  Without any information as to why Mr. Vogt's trial counsel decided not to present expert testimony on this issue, and in light of the legitimate tactical reasons that support his counsel's decision, Mr. Vogt cannot show that his counsel's performance was deficient under the first *Strickland* factor.  *Burt*, 571 U.S. at 23.

45

Further, the state appellate court reasonably concluded that Mr. Vogt was not prejudiced under the second *Strickland* factor because the "main flaws in CSAAS highlighted by Dr. Ermshar in the new trial motion . . . were directly elicited from Dr. Wolf on cross-examination." Ex. H at 32; *see Richter*, 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). Dr. Ermshar also testified that "the problem of suggestibility was 'less of a possibility' where the report was spontaneously made by an abused child to a peer, without influence from a parent, authority figure or interviewer," as was the case here. Ex. H at 32. As a result, the court reasonably concluded that Mr. Vogt "fails to show a reasonable probability of a different result had his counsel presented an expert to testify consistent with the proposed testimony of Dr. Ermshar." *Id.* at 32–33.

The Court **DENIES** Mr. Vogt's ineffective-assistance-of-counsel claim regarding the failure of his trial counsel to object to the CSAAS jury instruction and present opposing CSAAS expert testimony.

### 2. Failure of Trial Counsel to Object to Child Pornography Evidence

Mr. Vogt urges that his trial counsel was also ineffective in failing to properly object to the evidence of child pornography videos on the Dell computer. Pet. at 43–44, 52. His argument fails, however, because his trial counsel did object to the admission of the child pornography evidence. Specifically, Mr. Vogt's trial counsel argued that the child pornography evidence was more prejudicial than probative, especially because the probative value was undermined by the lack of evidence that Mr. Vogt had downloaded the child pornography videos. Docket No. 29-14 ("10RT") at 1077–78. Mr. Vogt does not explain what further objection his trial counsel should have made. Answer at 40. Furthermore, because the state appellate court reasonably concluded that the child pornography evidence had been properly admitted, *see supra* Part IV.C.1.b, it reasonably held that defense counsel had not been ineffective for failing to bring a meritless objection. Ex. H at 15; *see Martinez*, 926 F.3d at 1226.

Accordingly, the Court **DENIES** Mr. Vogt's ineffective-assistance-of-counsel claim for

1 failure to object to the admission of child pornography evidence.

2         3.     <u>Failure of Trial Counsel to Consult With and Present the Testimony of a Defense</u>

3                  <u>Forensic Computer Expert</u>

4       Next, Mr. Vogt asserts that his trial counsel's failure to engage a defense forensic computer

5 expert violated his right to counsel. Pet. at 53–61. At trial, one of the crucial questions was who

6 possessed and controlled the Dell computer that contained the child pornography videos, but

7 defense counsel failed to consult with or present the testimony of a defense forensic computer

8 expert. Pet. at 53. As a result, Mr. Vogt asserts that "the child pornography found on the Dell

9 laptop was linked to [him] by the unrebutted testimony of Terence Wong," the prosecution's

10 expert. *Id.* at 60. Mr. Vogt argues that his trial counsel also failed to impeach the oldest sister,

11 Melissa who had told investigators that the Dell computer belonged to Keith Addison, Jo.A.'s

12 father. Pet. at 53; *see* Docket No. 29-2 ("3 C.T.") at 646 (an email exhibit from the deputy district

13 attorney to Vogt's trial counsel, Steve Whitworth stating "Sgt. Chetcuti and I met with Melissa

14 this afternoon. In speaking with her about the computers in the house . . . Keith brought a Dell

15 desk top [sic] when he moved in. It was kept in the backroom and side room. The people with

16 access to that Dell were Kyle, [Jo.A], and Keith."). According to Mr. Vogt, at the motion for new

17 trial hearing, his new counsel presented the testimony of a forensic computer expert, Samuel

18 Plainfield, that contradicted the testimony of Wong, on the question of whether Mr. Vogt had the

19 sole possession and control of the Dell computer. Pet. at 53. Plainfield testified that "at least one

20 other adult male had access to the computer and was a possible or likely candidate for having

21 created the child porn files found in the computer." *Id.* Thus, in Mr. Vogt's view, his trial

22 counsel's failure to present opposing expert testimony and the impeachment evidence constituted a

23 denial of his right to effective assistance of counsel. Pet. at 54.

24       To the contrary, the state appellate court's rejection of Mr. Vogt's assertion and application

25 of *Strickland* under the second factor was reasonable. The state court did not conclude whether

26 Mr. Vogt failed to show deficient performance under the first *Strickland* factor. Ex. H at 21–22.

27 It acknowledged that "the record sheds no light on why defense counsel failed to present a forensic

28 computer expert" and in such cases defendants cannot show that their counsel's performance was

United States District Court
Northern District of California

1   deficient. *Id.* at 21.  But although the court held that the Respondent's argument was

2   plausible—that defense counsel strategically decided not to present a defense expert whose own

3   analysis might have led to the discovery of further evidence linking Mr. Vogt to the Dell

4   computer—it concluded that the Respondent had not explained why defense counsel failed to

5   obtain a copy of the Dell's hard drive. *Id.* at 21–22.  As a result, the court could not "assume

6   defense counsel had any kind of meaningful consultation with a forensic computer expert while

7   lacking sufficient information on the contents of the hard drive." *Id.* at 22.

8          Instead of deciding whether defense counsel's failure to engage a defense forensic expert

9   was deficient, the court relied on the second *Strickland* factor to reject Mr. Vogt's assertion. *Id.*

10  The court held that Mr. Vogt had "not sufficiently demonstrated a reasonable probability that the

11  outcome would have been different absent the claimed error." *Id.*  It relied on the trial court's

12  finding that Plainfield himself could not exclude Mr. Vogt "as a user of the Dell computer or as a

13  person who accessed the child pornography at the relevant time periods." *Id.*  The court also held

14  that a defense expert was unnecessary to show that Mr. Vogt was not the sole user of the Dell

15  computer. *Id.*  Jo.A. admitted during cross-examination that she occasionally used the Dell

16  computer to download photographs and Wong testified that he saw other email addresses on the

17  computer and could not conclusively determine who controlled the computer. *Id.*

18         The state appellate court also recognized the risks of the defense expert's testimony, *e.g.*,

19  that Plainfield found that his search yielded 428,741 hits for "Kyle" compared to the next most

20  frequent term, 8,671 hits for "Jo.A.," which may have tended to suggest that Mr. Vogt was the

21  primary user of the Dell computer. *Id.* at 23.  Defense's focus on the Dell computer's ownership

22  could have revealed the additional evidence found in Wong's post-trial examination—*e.g.*, the

23  pornography files found in the Limeware saved folder contained duplicates of music files found in

24  another folder called "KYLE'S IPOD MUSIC! DO NOT DELETE!!!!" as well as flash cookies

25  that showed that Mr. Vogt had used the computer on July 16, 2009, and August 4, 2009, which

26  was closer to the time of the child pornography downloads than previously discovered. *Id.*; 14RT

27  at 1559–61, 1565–68.  The court also found that a defense expert could not have impeached the

28  other witnesses' testimony that Mr. Vogt was the sole user of the Dell computer because none of

48

United States District Court
Northern District of California

1   the witnesses, including Melissa, testified so in conclusive terms. *Id.* at 23–24.

2       Accordingly, the state court reasonably concluded that Mr. Vogt had not demonstrated

3   prejudice under *Strickland* and therefore the Court **DENIES** his ineffective assistance claim on

4   these grounds.

5       4.      Failure of Trial Counsel to Impeach Two Witnesses and Call One Witness

6       Mr. Vogt asserts that his trial counsel was also ineffective for (1) not using juvenile

7   records to impeach Jo.A.; (2) not calling his friend Amanda Hartman as a witness; and (3) not

8   impeaching Melissa with her prior statement to the police. Pet. at 68–75. The state appellate court

9   reasonably applied the *Strickland* standard when it rejected Mr. Vogt's claims.

10      First, the state appellate court reasonably concluded that Mr. Vogt's trial counsel's failure

11  to use juvenile records to impeach Jo.A. did not constitute deficient performance and did not

12  prejudice Mr. Vogt. Mr. Vogt argues that the juvenile records would have led to information

13  suggesting that Keith, Jo.A.'s father, was a potential suspect and would have impeached Jo.A.'s

14  testimony. Pet. at 68; Traverse at 25. Before trial, Mr. Vogt's trial counsel stated that he intended

15  to file the Welfare and Institutions Code section 827 motions to view records regarding various

16  juvenile witnesses in the case, but he never did. *See* Ex. H at 33. During his motion for a new

17  trial, Mr. Vogt attached the juvenile records as exhibits and his expert witness Carr testified that

18  his trial counsel provided ineffective assistance for failure to obtain the records for the purposes of

19  impeaching the credibility of Jo.A. and "suggesting Keith was another potential suspect." Pet. at

20  73; Ex. H at 33.

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████  ████  ████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [14] "AugCT" stands for Augmented Clerk's Transcript.

United States District Court
Northern District of California

The state appellate court reasonably rejected Mr. Vogt's claim of ineffective assistance of counsel because "the record sheds no light on why counsel did not obtain and present the juvenile records at trial" it. *Id.*; *see also Burt*, 571 U.S. at 23.  And "[e]ven assuming deficient performance," the court reasonably concluded that Mr. Vogt was not prejudiced because "it is highly unlikely the trial court would have admitted the juvenile records into evidence" or "that it would have allowed witnesses to be cross-examined on the events in the records," given that the trial court denied the motion for new trial.  *Id.* at 33–34.  To admit the evidence would have "required a mini-trial on events having very little to do with this case in order to resolve the conflicting statements contained therein."  *Id.* at 34.  Moreover, the court reasonably held that Mr. Vogt's "arguments about the impact of the records is highly speculative."  *Id.*  For example, although the records may have undermined Jo.A.'s credibility, her testimony about Mr. Vogt's abuse was bolstered by the testimony of K.A.  *Id.*  The court also noted that Mr. Vogt made no argument as to how the juvenile records would have undermined the credibility of the other victims, J.A. and A.P.  *Id.*  For these reasons, the state court reasonably applied the *Strickland* standard in denying Mr. Vogt's claim.

Likewise, the state court reasonably denied Mr. Vogt's ineffective assistance of counsel claim on the basis that his trial counsel failed to call his friend who he lived with on occasion, Amanda Hartman, as a witness.  Mr. Vogt asserts that Hartman would have provided "at least a partial alibi" for him because she could testify that Mr. Vogt did not live at the victim's house in

1    South San Francisco on some of the dates when the child pornography videos were created at the

2    victim's house. Pet. at 68, 74. Specifically, Hartman would have testified that Mr. Vogt lived

3    with her and her boyfriend for one week in Sacramento in late May or early June 2009, and that he

4    lived in Davis or Woodland in the summer of 2009.[15] Ex. H at 34.

5         But the court reasonably concluded that Mr. Vogt failed to show that his trial counsel's

6    conduct was deficient because the record, again, shed no light on why his counsel did not call

7    Hartman as a witness. *Id.* The court also acknowledged that "[c]ompetent defense counsel may

8    have determined that Hartman's testimony was not a strong alibi defense" and that her testimony

9    may have "conflict[ed] with the testimony of defendant's character witness, Sanderford, who

10   testified that defendant was living in the Bay Area in the summer of 2009." *Id.* at 35. Sanderford,

11   who lived in Woodland, had dated Mr. Vogt for approximately six months, starting in either

12   spring or summer of 2009, and testified that he was living in the Bay Area when they were dating.

13   *See* 10RT at 1097. The court also reasonably held that Mr. Vogt was not prejudiced by the

14   absence of Hartman's testimony because Hartman testified that she did not know whether Mr.

15   Vogt had a computer with him at the time he stayed with her and therefore she could not have

16   established that he did not have the Dell computer with him. *Id.*; *see* 14RT at 1543. Therefore,

17   Mr. Vogt's claim on these grounds fails.

18        Third, the state court reasonably denied Mr. Vogt's ineffective assistance of counsel claim

19   on the grounds that his trial counsel failed to cross-examine Melissa regarding her prior statements

20   to the police. During the direct appeal and in his petition, Mr. Vogt argues that Melissa's

21   following statement undermines J.A.'s claims of being raped and assaulted by him on 10 different

22

23   _____

24   [15] Mr. Vogt mischaracterizes Hartman's testimony when he argues that she testified that he had
     "lived in Woodland and Davis from June through October 2009." Pet. at 73 (citing 14RT at
     1537). In actuality, Hartman was unable to testify that Mr. Vogt lived in Woodland or Davis

25   because no foundation could be established. *See* 14RT at 1537–39. Instead, Hartman testified
     that Mr. Vogt stayed with her and her boyfriend in Woodland for one week in late May or early

26   June 2009, 14 RT at 1542, and she visited Mr. Vogt in Davis for one day in June 2009. 14RT at
     1541. Although she testified on direct that she visited Mr. Vogt in Davis in July, August,

27   September, and October, on cross-examination, she could not recall whether she had seen him in
     July or August. 14RT at 1539–42. She remembered seeing him in September but not whether it

28   was in Davis or Woodland and she did remember seeing him in Davis one day in October 2009.
     *Id.*

United States District Court
Northern District of California

1    occasions in Davis:  When asked by Sergeant Chetcuti whether her sisters were afraid of being

2    alone with Mr. Vogt, Melissa replied that J.A. "was barely even up in Davis.  She only visited like

3    a couple times and I can't even—I wasn't with Kyle the whole time I was there, so I can't even—"

4    *See* Ex. H at 35; Traverse at 25–26.  Mr. Vogt also argues that Melissa's statements provide

5    innocent explanations for why intimate pictures of Jo.A. were found on Mr. Vogt's phone and

6    Dell computer.  *Id.*  When asked about the photographs of Jo.A. found on Mr. Vogt's phone,

7    Melissa stated, "you would find the most pictures of [Jo.A.] on any of our stuff, because she loves

8    to take pictures" and "they all send pictures of each other. . . . Because they would send—

9    sometimes they'd send pictures of him and it would go to me and stuff like this."  *Id.* at 36.  When

10   asked if she thought it was odd that Jo.A. would be sending photographs of herself in her shorts

11   and then deleting them, Melissa responded, "I think [defendant and Jo.A.] shared some phones.

12   And [Jo.A.], uh, [Jo.A.]'s been known to send photos to her boyfriend."  *Id.*

     The state court reasonably concluded that Mr. Vogt failed to show that his trial counsel acted

13

14   deficiently, even though the record contained no explanation for the counsel's decision not to

15   cross-examine Melissa regarding her statements about J.A. rarely visiting Davis.  *Id.* at 36.  As the

16   court noted, Mr. Vogt's trial counsel may have made a tactical decision not to cross-examine

17   Melissa about these statements after determining that she was a "sympathetic witness" such that

18   "it would not have been a wise trial strategy to attack her testimony with statements she made to

19   the police while she was still in a state of shock from learning about the allegations."  *Id.*  The

20   court also noted that counsel could not have impeached Melissa about her statements about the

21   photographs because she was never questioned about the photographs during trial.  *Id.*  And even

22   if the court assumed the counsel's performance was deficient, the court reasonably concluded that

23   there was no reasonable probability of a different outcome—"Melissa's statement to Chetcuti was

24   made early in the investigation before she had time to refresh her recollection, and the statement

25   was both vague and facially incomplete."  *Id.* at 37.  J.A. and Luisa had also corroborated

26   Melissa's trial testimony about the frequency of J.A.'s visits.  *Id.*

27          Accordingly, the state court reasonably applied the *Strickland* standard in rejecting these

28   three claims for ineffective assistance of counsel.  The Court **DENIES** Mr. Vogt's ineffective

assistance of counsel claim on these grounds.

     5.       Failure of Appellate Counsel to Consistently Advance Federal Constitutional Claims and Cite Relevant Federal Authorities

Finally, Mr. Vogt asserts that he was denied effective assistance of appellate counsel "to the extent that his federal constitutional claims were not consistently advanced or repeated at each stage of the state appellate process, or relevant federal authorities were not cited to the state courts." Pet. at 75.  As a result, he argues that all his federal habeas claims should be reviewed "despite any apparent procedural default or failure of exhaustion." *Id.* at 76.  However, Mr. Vogt's appellate counsel's alleged failure did not prejudice him because none of Mr. Vogt's claims has merit.  Answer at 66; *see Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("Appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal.").  Therefore, the Court **DENIES** this claim as well.

## V.      CONCLUSION

For the reasons above, the petition for writ of habeas corpus is **DENIED** on the merits.

This order disposes of Docket No. 1.  The Clerk of Court is instructed to enter Judgment and close the case.

     **IT IS SO ORDERED**.

Dated: May 23, 2022

                                 _____
                                   EDWARD M. CHEN
                                   United States District Judge

United States District Court
Northern District of California